IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Elkins Division

ALLEGHENY WOOD PRODUCTS, INC.,

      Plaintiff,

v.

UNITED STATES FISH AND WILDLIFE
SERVICE and MARTHA WILLIAMS, in her
official capacity as the Director of U.S. Fish
and Wildlife Service

and

UNITED STATES DEPARTMENT OF THE
INTERIOR and DEB HAALAND, in her
official capacity as the Secretary of the U.S.
Department of the Interior

      Defendants.

Civil Action No. 2:22-cv-07

## SECOND SUPPLEMENTAL COMPLAINT

Plaintiff Allegheny Wood Products, Inc. ("AWP") alleges as follows for its Second Supplemental Complaint against Defendants the United States Department of the Interior; the United States Fish and Wildlife Service; Deb Haaland, in her official capacity as Secretary of the U.S. Department of the Interior; and Martha Williams, in her official capacity as Director of the U.S. Fish and Wildlife Service (collectively, "Defendants"):

### NATURE OF ACTION

1.     Because AWP's proposed land use may incidentally affect habitats of threatened or endangered species, AWP applied to the U.S. Fish and Wildlife Service

for an Incidental Take Permit under Section 10(a)(1)(B) of the Endangered Species Act. Though AWP began this application process more than 16 years ago, its application remained unresolved and stuck in perpetual administrative limbo. Because of complete agency inaction—which AWP believes to be intentional—AWP was forced to file this lawsuit to prompt a timely disposition of its application. Only then did Defendants reject a critical component part of AWP's application, meaning that Defendants would cease processing AWP's application all together. Defendants' decision was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. Defendants' stated reasons for their decision are merely pretextual. Defendants have no intention of approving AWP's application, so it continues to move the goalpost and manufacturer barriers to approval. Because Defendants have abdicated their statutory duty to properly process AWP's application, AWP has suffered irreparable harm, been deprived of valuable property rights, and forced to incur unnecessary and ongoing expense attributable to a never-ending application review process. For these reasons, AWP brings this lawsuit under the Administrative Procedure Act to overturn Defendants' recent decision and to compel a prompt disposition of its application.

## PARTIES, JURISDICTION, AND VENUE

2. Plaintiff Allegheny Wood Products, Inc. is a West Virginia corporation with a principal place of business in Petersburg, West Virginia.

3.     Defendant United States Department of Interior (the "DOI") is a department of the United States government.  Defendant Deb Haaland is the current Secretary of the DOI.

4.     Defendant U.S. Fish and Wildlife Service ("FWS") is a bureau within the DOI.  Defendant Martha Williams is the current Director of FWS.

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (Federal Question) because it is a civil action arising under the laws of the United States.  This Court likewise has jurisdiction pursuant to 28 U.S.C. § 1361 (Mandamus Act).

6.     Venue in this Court is proper because a substantial part of the events or omissions giving rise to this action occurred in this district and the property that is the subject of this action is situated in this district.  *See* 28 U.S.C. § 1391(e).  In particular, the property that is the subject of this action is located in Tucker County, West Virginia and FWS's Field Office, which is principally responsible for processing the subject permit, is also located in Tucker County, West Virginia.

7.     AWP's claims arise under the Administrative Procedure Act (the "APA"), rather than the Endangered Species Act (the "ESA").  *See Conservation Force v. Salazar*, 699 F.3d 538, 540 (D.C. Cir. 2012) (providing that claims of agency inaction with respect to ESA permitting arise under the APA rather than the ESA). The relief sought is further authorized by 28 U.S.C. § 2201 (Declaratory Judgment Act), 28 U.S.C. § 2202 (Injunctive Relief), and 28 U.S.C. § 1361 (Mandamus Act).

### APPLICATION PROCESS

8.     The ESA generally prohibits the taking of any threatened or endangered species.  *See* 16 U.S.C. § 1538.  A "take" is defined broadly to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

9.     There is, however, an exception to this general prohibition.  FWS may issue an Incidental Take Permit ("ITP") if the taking "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  *See* 16 U.S.C. § 1539(a)(1)(B).  Here, any supposed "take" would be incidental to carrying out otherwise lawful activities, which are identified in AWP's ITP application.

10.     Even though the application process requires compliance with various legislative enactments and several levels of agency review, the schedule for application review is collapsed for sake of efficiency and timeliness.  As FWS explains it, the process is "not linear, it is iterative and many steps should occur concurrently."  *See* U.S. Fish and Wildlife Service HCP Handbook, at 2-1.  Some of the major milestones in the application process are as follows:

11.     *First*, the prospective applicant develops a Habitat Conservation Plan ("HCP"), which is a long-term plan to avoid, minimize, or compensate for adverse effects on listed species.  The HCP shall address, among other things, the impact from such taking, the steps to minimize and mitigate these impacts, and the funding that will be available to implement them.

12.    The size and complexity of the proposed development will necessarily determine the scope and complexity of the HCP.  During this HCP development phase, FWS is supposed to work collaboratively with the applicant and provide technical support and advice.  In practice, the applicant will submit drafts of the HCP to FWS, and FWS will provide comments for the applicant's consideration.

13.    *Second*, the applicant submits an ITP application, the proposed HCP, and the applicable filing fee.  FWS then reviews the application for technical and substantive completeness.  FWS will notify the applicant if the application is substantively incomplete and allow the applicant to resubmit any necessary information.

14.    *Third*, FWS determines whether the HCP meets the statutory issuance criteria.  In order to pass statutory muster, the HCP must identify: (a) the impact which will likely result from such taking; (b) what steps the developer will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps; (c) what alternative actions to such taking the developer considered and the reasons why such alternatives are not being utilized; and (d) such other measures that FWS may require as being necessary or appropriate for purposes of the plan.  *See* 16 U.S.C. § 1539(2)(a).

15.    *Fourth*, FWS conducts an intra-agency consultation to ensure compliance with the ESA after receiving the completed application and HCP.  As part of this intra-agency consultation, FWS must produce a biological opinion, which

5

analyzes the effects of issuing the permit—in particular, whether the proposed action is likely to jeopardize the continued existence of an endangered or threatened species or destroy or adversely modify designated critical habitat. *See* 16 U.S.C. § 1536(a)(2).

16.     *Fifth*, because the issuance of an ITP is a federal action subject to the National Environmental Policy Act ("NEPA"), FWS prepares one of three documents: (i) a Categorical Exclusion, when there is minor or negligible impact on the human environment; (ii) an Environmental Assessment ("EA"), when there is no significant impact on the human environment; or (iii) an Environmental Impact Statement ("EIS"), when there is significant impact on the human environment. Most HCPs do not qualify for a Categorical Exclusion. And unless significant impact is apparent— which is not the case here—FWS will prepare an EA.

17.     The Council on Environmental Quality ("CEQ") recommends that EAs be completed within 3 months or less. Indeed, even when an agency needs to exceed the CEQ's guidance, it should strive to conclude the EA review within 180 calendar days of the commencement date. EAs commence once FWS receives a completed application from a project proponent, receives or obtains sufficient information to analyze the proposed action (e.g., a draft HCP), publishes a Notice of Proposed Rulemaking in the Federal Register, or internally determines to pursue action planning.

18.     *Sixth*, FWS publishes notice of the ITP application in the Federal Register and allows 30 days for public comment. *See* 16 U.S.C. § 1539(c). Generally,

FWS publishes notice of the ITP application and the draft EA concurrently as the comment period for both notices is 30 days.  After the 30-day comment period, FWS will either make a Finding of No Significant Impact ("FONSI") or determine that an EIS is required.  Although FWS has not issued a FONSI, FWS has already indicated that an EIS will not be required here.

19.     *Finally*, if FWS determines—after a FONSI and consideration of public comment—that the HCP is statutorily complete and that the permit issuance criteria have been satisfied, it shall issue the ITP.  *See* 16 USC § 1539(a)(2)(B).

20.     Again, many of the steps in the application review process should be performed contemporaneously rather than consecutively.

21.     To aid its personnel in processing ITP applications, FWS's *Planning and Incidental Take Permit Processing Handbook* provides the following hypothetical timeline:



*See* U.S. Fish and Wildlife Service - HCP Handbook, at p. 2-1.

22.    In the case of a typical EA-level project—such as AWP's proposed project—FWS estimates that an HCP can be developed, reviewed, and approved in 21 to 24 months.

**OPERATIVE FACTS**

23.    At issue is a tract of property situated in Tucker County, West Virginia. Because AWP's proposed land use may incidentally affect habitats of threatened or endangered species, AWP applied to FWS for an ITP under section 10(a)(1)(B) of the ESA.

24.    On May 31, 2006, AWP submitted its first draft HCP for FWS's review and comment.

25.    Over the next several years, AWP and FWS negotiated the contents of the draft HCP.  AWP expended considerable sums on expert consultants to analyze and propose mitigation measures and craft a successful HCP.

26.    In keeping with the collaborative aims of the HCP development process, AWP would submit revised drafts of the HCP to FWS for its review and comment prior to applying for the ITP.  Prior to 2011, AWP submitted at least 9 different versions of the draft HCP to FWS.

27.    This collaborative process, however, was continuously frustrated by FWS's pattern and practice of delay which, at times, appeared intentional.  And with each subsequent version of the HCP, FWS would either request changes to sections

that were previously agreed upon or request foundational changes that should have been raised earlier.

28.     On March 3, 2013, AWP submitted yet another version of the draft HCP. Having received no feedback from FWS—by letters dated August 27, September 24, and October 13, 2015—AWP demanded an official response and explanation for the delay. Among other excuses, FWS noted threatened litigation from environmentalists and staffing shortages as the cause for delay.  In March 2016—more than three year later—FWS finally provided its comments to the March 3, 2013 draft HCP.

29.     On June 12, 2017, AWP submitted yet another version of the draft HCP to FWS for its review and comment.  FWS expressed its intention to provide comments by September 2017, but no comments were forthcoming.

30.     On December 28, 2017, having heard nothing from FWS, AWP went ahead and submitted its ITP application.  Included with the application was an application fee, the most recent version of the draft HCP, and an administrative Environmental Assessment.

31.     Once the ITP application was submitted, FWS went silent. From January to March 2018, AWP made repeated requests to FWS for comment and update.  None were received.

32.     Because the FWS Field Office was unwilling to advance AWP's application in any appreciable way, AWP asked that FWS's Regional Office intervene.

In response, the Regional Office assured AWP of better engagement and more timely assistance.

33.    Despite these assurances, FWS continued to ignore AWP's requests for comment and update from April to September 2018.  On September 20, 2018, FWS suggested that it was "still struggling under a massive workload of Section 7 consultations for pipeline (FERC) and coal projects" and that "lawsuits and FOIAs associated with these projects are preempting other great work."

34.    On May 31, 2019—nearly 1.5 years later—FWS finally provided its substantive responses to the December 28, 2017 draft HCP.  Many comments were outside the scope of the issuance criteria and reflected ambiguous policy preferences. Other comments were purely cosmetic in nature (e.g., outline order and grammar). It was becoming clear that FWS intended only to drag this review process out for as long as possible.

35.    To illustrate how FWS continued to move the goal posts, in an April 2019 meeting, FWS suggested that the term of the ITP be reduced from 50 years to 30 years to account for "any climate changes."  This was the first time FWS had taken issue with the term of the permit, some 13 years later.

36.    Between June 2017 and July 2020, AWP issued 10 different versions of the draft HCP. FWS's Field Office verbally acknowledged that the then-most-recent version of the HCP (v.10, July 24, 2020) was ready to submit to FWS's Regional Office and DOI's Office of the Solicitor for review.  Yet, FWS has still not published notice of the application and HCP in the Federal Register.  It is also unclear as to whether

the application package has been sent to FWS's Regional Office and DOI's Office of the Solicitor for their official review.

37.   On August 4, 2020, under continuing pressure to conclude the review process, FWS provided a proposed timeline by which it anticipated completing remaining milestones.   This timeline might have been appropriate had the HCP development process just begun, but the HCP had been under review for nearly 14 years by this point.   Notably, this proposed timeline still predicted a 13-month horizon until final approval and ITP issuance.

38.   Not surprisingly, FWS failed to meet these most-recent internal deadlines:

a.   By September 25, 2020, FWS's Field Office should have provided a draft EA and HCP to FWS's Regional Office and DIO's Office of Solicitor for review.   Upon information and belief, FWS has yet to do so.

b.   By December 18, 2020, FWS's Field Office should have provided a draft EA and HCP to FWS's Regional Office and DIO's Office of Solicitor for final review.   Upon information and belief, FWS has yet to do so.

c.   By March 5, 2021, FWS's Field Office should have certified that AWP's ITP application was complete.   FWS has yet do so.

      d.  By March 10, 2021, FWS should have published notice of the ITP application, draft HCP, and draft EA in the Federal Register for public comment.  FWS has yet to do so.

39.     FWS's *Planning and Incidental Take Permit Processing Handbook* estimates that—in the case of a typical EA-level project such as this one—an HCP can be developed, reviewed, and approved in 21 to 24 months.  FWS has missed this mark by more than 13 years.

40.     The CEQ recommends that EAs be completed within 3 months or less.  And even if circumstances require that FWS exceed the CEQ's guidance, DOI's own internal guidance still directs FWS to conclude the EA review within 180 calendar days of the commencement date.  At the earliest, the clock began to run when AWP submitted its first draft HCP 15 years ago.  At the latest, the clock began to run when AWP submitted its ITP application 3.5 years ago.  For some unexplained reason, Defendants have yet to prepare a biological opinion, as required by the ESA, or an environmental review, as required by NEPA.

41.     Because of complete agency inaction—which AWP believes to be intentional—AWP was forced to file this lawsuit to prompt a timely disposition of its application.  *See* ECF No. 1.

42.     By letter dated October 17, 2022, FWS rejected AWP's latest proposed HCP (v.11, December 7, 2021).  Notably, it took more than 10 months and a lawsuit to prompt a response from FWS on the latest proposed HCP.

43.     Given rejection of the HCP, which is a critical component part of any ITP application, FWS stated that it would cease processing AWP's application all together.

## COUNT I
### UNLAWFUL AGENCY ACTION

44.     The APA provides that the court must "hold unlawful and set aside agency action, findings and conclusions" that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

45.     Defendants' rejection of the latest HCP, along with the refusal to further process AWP's application, constitutes de facto denial of the application and final agency action.

46.     Among other findings, AWP challenges as arbitrary and capricious FWS's findings that (i) the covered activities are not described in sufficient detail to facilitate the required analyses of impacts, and (ii) the accounting of the potential take of the seven covered species is incomplete and the impacts which will supposedly result from that take are not sufficiently described.  FWS's stated reasons for rejecting the proposed HCP are merely pretextual, as FWS has never intended to approve AWP's application.

47.     Even then, the purported reasons for rejecting the proposed HCP are arbitrary, capricious, an abuse of discretion, and contrary to law insofar as FWS has (i) considered factors and imposed limitations not contemplated by the ESA, (ii)

refused to consider relevant information and explanations from AWP, and (iii) required a level of detail that is atypical and contrary to FWS's past practice for projects of the size proposed by AWP.

48.     This Court should set aside FWS's October 17, 2022 decision, which rejected AWP's proposed HCP and concluded the application review process.

For the foregoing reasons, Plaintiff requests the following relief:

A.  Issue declaratory judgment that Defendants' rejection of AWP's proposed HCP was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

B.  Set aside Defendants' decision rejecting AWP's proposed HCP and issue an order directing Defendants to provide dates by which they will conclude their review and resolve the outstanding application;

C.   Retain jurisdiction of this case until final agency disposition of the pending application as a whole;

D.  Award AWP their costs and expenses of litigation, including reasonable attorneys' fees pursuant to 28 U.S.C. § 2412; and

E.  Grant such other relief that this Court deems necessary.

PLAINTIFF DEMANDS A TRIAL BY JURY OF ANY TRIABLE ISSUES

14

**ALLEGHENY WOOD PRODUCTS, INC.**

By Counsel:


/s/ Andrew C. Robey
Isaac R. Forman (WVSB # 11668)
Andrew C. Robey (WVSB #12806)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
t: 681-265-3802
f: 304-982-8056
iforman@hfdrlaw.com
arobey@hfdrlaw.com

## **CERTIFICATE OF SERVICE**

I certify that on January 6, 2023, I filed the foregoing via the CM/ECF system, and the foregoing document was served on all counsel of record through the CM/ECF system.

/s/ Andrew C. Robey
Andrew C. Robey (WVSB #12806)