IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION

ALLEGHENY WOOD PRODUCTS, INC.,

       Plaintiff,

v.                                                    Civil Action No. 22-cv-00007

UNITED STATES FISH AND WILDLIFE
SERVICE, et al.,

       Defendants.

## MEMORANDUM OF LAW SUPPORTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This case is about a federal agency's abuse of bureaucratic machinery to thwart lawful economic activity and development in West Virginia. Because Allegheny Wood Products, Inc.'s ("AWP") proposed land use (timbering and residential development) may incidentally affect threatened or endangered species, AWP applied to the U.S. Fish and Wildlife Service ("FWS") for an Incidental Take Permit ("ITP") under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, et seq. However, after more than sixteen years pursuing that permit, AWP's application remained unresolved and stuck in perpetual administrative limbo. Because of complete agency inaction—which AWP believes to be intentional—AWP was forced to file this lawsuit to prompt a timely disposition of its application. Only then did FWS reject AWP's application as statutorily incomplete. AWP now asks this Court to set that decision aside under the Administrative Procedure Act ("APA") as arbitrary, capricious, and not in accordance with law.

Though there are plenty of substantive problems with FWS's decision, AWP takes specific aim at FWS's objectively-measurable procedural misstep. In particular, before an application can be advanced from the intake stage, FWS must assess its completeness based on a handful of clearly-defined form requirements. Only after an application is deemed statutorily complete, and submitted for public comment, is FWS permitted to challenge its substantive scientific conclusions. However, in its zeal to stonewall AWP's application, FWS put the cart before the horse. Instead of performing the formalistic review of AWP's application at the intake stage, FWS rejected AWP's application based on substantive criteria found elsewhere in the ESA and reserved for later in the process. This was a clear misapplication of law for which FWS is entitled to no special deference under the APA.

## BACKGROUND

From an applicant's perspective, the permitting process revolves around creating a Habitat Conservation Plan ("HCP"). An HCP, generally speaking, describes the planned commercial activity and the steps the applicant will take to minimize or mitigate impacts on endangered or threatened species. *See* 16 U.S.C. § 1539(a)(2)(A). The HCP can be thought of as any government form or application: the applicant need only check all the right boxes and provide all the right descriptions to make the HCP formally complete. And because the ESA is not designed to halt economic development, but rather to harmonize development with covered species,

FWS is charged with collaborating with ITP applicants to efficiently and effectively advance an HCP to approval. *See generally* HCP Handbook.[1]

In March 2006, AWP began the process of creating an HCP with the assistance of FWS. *See* AR7739-46. In keeping with the collaborative aims of the HCP development process, AWP began expending substantial sums on experts and consultants and submitted numerous revised draft HCPs to FWS for its review and comment.

On March 3, 2013, AWP submitted yet another draft HCP for FWS's review. AP4384. Having not received comments on this latest draft, on October 23, 2013, AWP reached out for a response. AR4383. FWS's representative responded that she hadn't had time to review the HCP and likely would not before her retirement in December. AR4382. Internally, John Schmidt, the Field Office Supervisor, requested "help," suggesting that, "I can meet with [AWP] but my knowledge of the HCP process is minimal." AR4380. Mr. Schmidt reported back to AWP that "I am still trying to get feedback from our [regional office] on this project" but "no luck to date." AR4377.

On July 3, 2014, AWP requested the contact information for the FWS representative responsible for reviewing its HCP. AR4377. On August 20, 2014, Mr. Schmidt, the FWS field supervisor, again solicited help internally at FWS, stating that, "It really looks bad that we keep putting them off." AR4376. On August 27, 2015,

---

[1] FWS touts the HCP Handbook as its authoritative guide for both it and applicants. *See* HCP Handbook, at i.  The HCP Handbook is attached as **Exhibit A** and publicly available at: https://www.fws.gov/sites/default/files/documents/habitat-conservation-planning-handbook-entire_0.pdf

having not heard from FWS in over a year, AWP again requested a response on its HCP, which FWS had received 2 ½ years ago. AR4374. Internally, Mr. Schmidt noted for his team that "our (yours and my) inability to act on this has precipitated a strongly worded request from Allegheny Wood Products." AR4373. Despite this realization, FWS still failed to respond.

On September 24 and October 13, 2015, AWP again requested FWS's attention. AR4367, 4361. Only on November 10, 2015, did FWS muster a response. AR4344. Among other excuses, FWS claimed that threatened litigation from environmentalists and staffing shortages prevented it from timely considering AWP's draft HCP. *Id.* Curiously, the administrative record during this period shows no activity outside the above-described communications. On April 20, 2016—three years after having received it—FWS finally provided its comments to the HCP. AR4153.

On June 12, 2017, AWP incorporated the latest comments and revisions and submitted yet another draft HCP to FWS. AR3863, 3812. Though FWS indicated that it intended to provide additional comments by September 2017, it predictably failed to do so. AR3808. AWP was instead told that FWS's review would not begin until the New Year. AR3812. When that deadline passed without response, FWS then advised that review would not begin until February 2018. *Id.*

On December 28, 2017, having not received further feedback from FWS and having dealt with over a decade of delay, AWP went ahead and submitted its application for an ITP permit, along with the required filing fee and other related documents. AR3856. AWP saw no point in delaying their application further.

On March 26, 2018, still having not received comments from FWS, AWP made "an urgent request for an update on [FWS's] progress towards reviewing the [HCP] and processing AWP's application." *Id*. Aside from substantive feedback, AWP also complained that FWS didn't even have the courtesy to acknowledge receipt of AWP's repeated messages. *Id*. Nonetheless, AWP suggested that, if the FWS office was too busy to work on the HCP, then FWS should accept AWP's application and allow it to proceed through public comment in the interim. *Id*. The HCP could be further refined after public comment. But FWS's radio silence persisted. Between January 2018 and May 2018, AWP made repeated requests to FWS for an update to no avail. AR3812, 3807. Having heard nothing from FWS's field office, AWP then asked FWS's regional office to intervene, which AWP hoped would spur a response. AR3794. The regional office assured AWP of better engagement and more timely assistance, but that promise would ring hollow. AR3770.

From May 2018 to September 2018, FWS continued to ignore AWP's requests for comment and update. On September 20, 2018, FWS suggested that it was "still struggling under a massive workload of Section 7 consultations for pipeline (FERC) and coal projects" and that "lawsuits and FOIAs associated with these projects are preempting other great work." AR3803. Despite this project being "in process for at least ten years," FWS stated that it was "a medium priority compared to Laurel Mountain and other projects." AR3801-02. Nonetheless, FWS promised to respond to the latest HCP within 30 days, or October 20, 2018. AR3803.

Predictably, FWS blew through this deadline too. And that was probably for a reason. On February 5, 2019, Chase Allred, the FWS representative chiefly responsible for reviewing and commenting on AWP's submissions since July 2017, requested help internally at FWS, stating that "I am willing to admit that this HCP is out of my wheelhouse and I need help." AR3801. Kevin Connally, FWS's HCP Coordinator in Massachusetts, essentially stated that he was too busy to afford this project any real attention. AR3801.

On May 16, 2019—nearly 1½ years after receiving AWP's completed application, and well past FWS's latest assurance—FWS finally responded to AWP's December 2017 application. SAR740, AR3653. Many of FWS's comments focused on final issuance criteria, instead of criteria used to measure the statutory completeness of an application, which was the only relevant consideration at this juncture. For example, FWS stated that the HCP did not satisfy the requirements to "minimize and mitigate the impacts of such taking . . . to the maximum extent possible." SAR748. This is a final issuance criterion under 47 U.S.C. § 1539(a)(2)(B), not a statutory completeness criterion under 47 U.S.C. § 1539(a)(2)(A). Moreover, FWS suggested for the first time that AWP should consider shortening the permit duration from 50 years to 30 years to account for "climate change." SAR749. The remaining comments failed to explain FWS's criticisms with any level of specificity, offering instead broad and generalized pronouncements about the HCP process. SAR741-750. AWP nonetheless continued to engage in this supposedly collaborative HCP development process.

6

During the period May 2019 to July 2020, AWP submitted four additional versions of its HCP. AR3136-37. On July 24, 2020, FWS verbally acknowledged that the latest of those versions was ready to submit to the regional office and legal counsel for their review (AR3136-37), which is the last step before publishing the application in the Federal Register. *See* FWS Permit Handbook at 14-14. Yet publication in the Federal Register never came, and it is unclear whether FWS ever actually sent AWP's application package to the regional office and legal counsel.

On August 4, 2020, FWS proposed a timeline for its completion of remaining milestones in the application process. AR3138. That timeline projected another thirteen months until permit issuance—on top of the nearly fourteen years since AWP started the application process. AR3139. Unsurprisingly, FWS failed to meet its deadlines. For instance, FWS was supposed to forward the application materials to the Office of the Solicitor for its review by September 25, 2021. *Id.* There is no indication this ever happened.

On January 22, 2021, AWP submitted its tenth version of the HCP to FWS. AR1588, 1740. On February 26, 2021, FWS provided additional revisions. AR1538. On December 7, 2021, AWP incorporated the latest-round of revisions and submitted the 11th draft of the HCP. AR57. Realizing that FWS never intended to issue the requested permit and that FWS would continue to string the process along with never-ending criticisms, AWP requested that FWS consider the 11th draft of the HCP to be final and that FWS publish the complete application package for public comment. *Id.*

On February 15 and March 8, 2022, AWP requested an update from FWS. AR82. When FWS ultimately responded, it feigned surprise, claiming that "the revised draft HCP in December was not anticipated." AR78. FWS claimed that its "workload [had] increased significantly" and the unanticipated submission did not afford it an opportunity "to plan and allocate staff work time." *Id*. FWS did not explain what it had been doing in the preceding three months (apparently not allocating staff), but indicated that it would "determine the allocation time for the review of the draft HCP within our workload." *Id*. When AWP requested even the most general timeline for FWS's review, FWS ceased communications. AR66.

In June 2022, having heard nothing further from FWS, AWP filed this lawsuit, stating a single claim for unreasonable delay under the under the Administrative Procedure Act. ECF No. 1. Only after AWP filed this lawsuit did FWS finally respond—and reject—AWP's application in October 2022. AR59. In light of this post-complaint rejection, AWP filed its Second Supplemental Complaint, asking this Court to set aside FWS's recent decision as arbitrary and capricious and not in accordance with law. ECF No. 25.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, courts must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (cleaned up). "Agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Magellan Tech., Inc. v. United States Food & Drug Admin.*, — F.4th —, 2023 WL 4035722, at *4 (2d Cir. June 16, 2023) (cleaned up). "It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decision making." *Bennett v. Spear*, 520 U.S. 154, 172 (1997).

## LEGAL FRAMEWORK

The ESA makes it unlawful for any person to "take" any member of endangered wildlife. *See* 16 U.S.C. § 1538(a)(1). The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The ESA, however, contains several exceptions to this broad prohibition on take. *See* 16 U.S.C. § 1539. Relevant here, the ESA allows FWS to issue an incidental take permit, which authorizes the take of protected wildlife when the taking is incidental to carrying out an otherwise lawful activity—here, timbering and residential development. *See* 16 U.S.C. § 1539(a). A permit holder will not be liable for any taking that falls within the scope of that permit. Before receiving a permit, an ITP application is subjected to three types of review—form, comment, and substance—which occur sequentially and are described in turn.

<u>Step 1: Form</u>

First, an applicant must submit a "complete application," which revolves around the drafting of an HCP. 50 C.F.R. § 17.22. An HCP must describe "(i) the impact which will likely result from such taking; (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps; (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan." *See* 16 U.S.C. § 1539(a)(2)(A). This initial hurdle is formalistic. FWS's scope of review is limited to determining whether the HCP is satisfactory as to form and includes all the mandatory elements. If an applicant submits a complete application package, then FWS shall certify the application as "statutorily complete." *See* HCP Handbook, at 14-4 ("The field office will review the package and send it to the Regional office along with a certification that they found the HCP to be statutorily complete (the HCP includes all mandatory elements)."). FWS will have the opportunity to challenge the substance of the HCP—competing scientific studies, disagreeing with calculations and conclusions, and the like—but not at this stage.

<u>Step 2: Comment</u>

Once the application is deemed "statutorily complete," the application package is submitted to the Federal Register for public comment. *See* 16 U.S.C. § 1539(c).[2] The

---

[2] This public notice will also typically include documents prepared under the National Environmental Policy Act ("NEPA"), which is a separate and overarching environmental law. FWS has not yet completed an Environmental Assessment as required by NEPA. As such,

public comments on the HCP are then considered as part of FWS's final substantive review of the application package. However, because FWS refused to deem AWP's application statutorily complete at Step 1, FWS never advanced AWP's application to Step 2's public comment.

<u>Step 3: Substance</u>

"After the public review period closes and the HCP documents have been revised, as appropriate, to address public comments, the Regional office reviews the field office recommendation to issue or deny the permit." HCP Handbook, at 2-18. Now, after approving the application as to form and submitting it for public review, FWS may scrutinize the substance of the HCP. In doing so, FWS analyzes the HCP through the lens of Sections 7 and 10 of the ESA. The application must pass muster under both sections before the applicant can receive a permit.

Section 7 requires that FWS ensure that agency action—here, the issuance of an incidental take permit—is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat." 16 U.S.C. § 1536(a)(2). FWS carries out its Section 7 function through an "intra-agency consultation" (a type of internal review). *See Loggerhead Turtle v. Cnty. Council of Volusia Cnty., Fla.*, 120 F. Supp. 2d 1005, 1012 (M.D. Fla. 2000). FWS must "use the best scientific and commercial data available" and report its findings in a biological opinion. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §

---

NEPA is not relevant to the immediate administrative challenge and therefore beyond the purview of this motion.

402.14(h). FWS has 90 days to complete the self-consultation, and 45 days after that consultation to write the biological opinion. *Id.* Though AWP submitted its application in December 2017, FWS never initiated Section 7 consultation or began preparing a biological opinion.

Section 10 provides that, "after opportunity for public comment," FWS shall issue a permit if FWS makes the following substantive findings: "(i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (v) the measures, if any, required under subparagraph (A)(iv) will be met." 16 U.S.C. § 1539(a)(2)(B). This third phase is when FWS is called to weigh substantive, scientific considerations. As explained below, FWS ignored the necessary three-step progression—form, comment, substance—by prematurely attacking the HCP's substance at Step 1.

## ARGUMENT

The focus of the immediate challenge is FWS's decision to reject AWP's application as statutorily incomplete. AR59-65 (Denial Letter). As explained below, FWS ignored the required procedures of decision making and considered factors beyond the scope of what is permitted.

## I.   AWP Submitted a Complete Application

In order to be statutorily complete, an application must include "(i) a complete description of the activity sought to be authorized; (ii) the common and scientific names of the species sought to be covered by the permit, as well as the number, age, and sex of such species, if known; and (iii) a conservation plan [or HCP]. 50 C.F.R. § 17.22. The HCP must simply state "(A) the impact that will likely result from such taking; (B) what steps the applicant will take to monitor, minimize, and mitigate such impacts, the funding that will be available to implement such steps, and the procedures to be used to deal with unforeseen circumstances; (C) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not proposed to be utilized; and (D) such other measures that the Director may require as being necessary or appropriate for purposes of the plan." *Id*. AWP's application and HCP go beyond what is actually required.

### A.   *Description of Activity*

The HCP provides a complete description of AWP's planned activity. AR111-20. It describes the two categories of activity—timbering and residential development—broken down by acreage and activity area. *See id*. The HCP states in greater detail the component parts of each activity. *See id*. For example, AWP describes all sub-activities inherent to timbering, such as cutting and delimbing, constructing new haul roads, maintaining existing haul roads, driving on existing haul roads, constructing and restoring new and old skid trails and log landings, and inspecting tree stands by foot. AR111-17. As to sub-activities for residential

development, AWP explains how it will construct and install roads and utility corridors, clear trees from building envelopes and private drives, construct community wastewater treatment facility, landscape and more. AR117-20. The covered activities are described in great detail in the body of the HCP (AR111-20) and, at FWS's request, summarized in the "effects matrixes" attached as appendixes (AR292-304). AWP clearly described the activities it proposes be covered by the permit. And should FWS ever complete a biological opinion, as it's supposed to, then there should be no guessing as to the scope of AWP's proposed activities.

## B. Description of Covered Species

The HCP defines the common and scientific names of the seven species sought to be covered by the permit. AR121-141. Consistent with the ESA's enabling statute and implementing regulations, the HCP explains why the number, age, and sex of each potentially affected specimen cannot be known based on scientific population studies. *See id.* Instead—and with FWS's concurrence—the HCP uses area of affected habitat as a surrogate for a precise count of each species. AR179-81.

## C. Likely Impact of Take

The HCP describes each proposed activity (e.g., timbering) and each related sub-activity (e.g., constructing new skid trails). AR292-304. For each activity and sub-activity, AWP describes the (1) the stressor, (2) the frequency and duration of that stressor, (3) the life stage affected, (4) each species' anticipated response to that stressor, and (5) the proposed mitigation and/or avoidance measures. *Id.* These descriptions of take are set forth in the body of the HCP (AR111-20), as well as the

"effects matrixes" that were added at FWS's instance (AR292-304). Applying the surrogate method, the HCP describes the likely impact on species habitat and, correspondingly, on the species themselves. AR179-81. The HCP further discusses likely impact in terms of context, severity, and duration for each species. AR182-93. Context includes total population of the covered species across their entire ranges and historical uses of the property and their impact on covered species. *See id.* Severity accounts for the total disturbed acreage measured against items like minimization efforts, like seasonal timber harvesting. *See id.* And duration includes the timeline for habitat recovery and potentially subsequent activity, like future selective timber harvesting. *See id.* The HCP's description and analysis of likely take goes well beyond what is required.

### D. Monitoring, Minimization, and Mitigation

The HCP itemizes AWP's minimization and mitigation steps, such as seasonal timber harvests, selective timbering, employee training, seasonal residential construction, and setting aside land for conservation. AR194-203. In fact, the HCP explains that AWP's minimization and mitigation steps should fully offset any impact on covered species. AR207-14. The HCP describes AWP's monitoring activities and explains that AWP will enter into research partnerships for study of the covered species. AR204-05. The HCP commits AWP to funding mechanisms to ensure adequate funding throughout the project. AR220-25. Lastly, the HCP sets forth AWP's planning for unforeseen circumstances. AR215-20. The HCP's description and analysis readily satisfies the minimum statutory and regulatory requirements.

### E. *Alternative Actions and Other Measures*

The HCP discusses no-take and reduced-take alternatives. AR105-07. The HCP states that AWP "rejected both alternatives on the basis that they do not provide sufficient flexibility for reasonable commercial uses and do not offer sufficient regulatory certainty." AR105 (cleaned up). Finally, the HCP includes a discussion of biological goals and objectives, AR193–94; adaptive management techniques, AR205; and reporting practices, AR205-06. These additional items were all added to the HCP at the behest of FWS and at the expense of AWP.

\* \* \*

Whether the HCP is statutorily complete is a purely formalistic exercise.[3] As explained above, the HCP checks each box and readily satisfies the criteria for statutory completeness. That FWS found otherwise was arbitrary and capricious and otherwise not in accordance with law.

## II.   **FWS's Criticisms are Unfounded and Inappropriate**

FWS identifies two "foundational issues," which it claims stand in the way of a complete application. AR60. According to FWS, "(1) the covered activities are not described with sufficient detail to facilitate the required analysis of impacts, and (2) the accounting of the potential take of the seven covered species is incomplete and the impacts which will likely result from that take are not completely described." *Id.*

---

[3] *See Loggerhead Turtle*, 120 F. Supp. 2d at 1019 (explaining that disagreement with an HCP's underpinnings is not relevant to whether the HCP satisfied the minimum criteria under § 1539(a)(2)(A) and 50 C.F.R. §§ 17.22(b)(1) and 17.32(b)(1)); *Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1291 (E.D. Cal. 2000) (finding that an HCP meets the minimum requirements of § 1539(a)(2)(A)).

(cleaned up). From these supposed foundational issues, FWS breaks its criticisms into six specific examples. AR62-65. But only two of those criticisms relate to the formalistic criteria for completeness, and the other four are substantive criticisms that should be reserved for after public comment.  AWP addresses each in turn.

*Formalistic Critique #1*

FWS contends that the HCP fails to adequately "deconstruct" the prospective use of skid trails and log landings.[4] AR63. FWS's criticism is unfounded because the HCP thoroughly describes those activities.  The HCP explains that all skid trails are temporary, used only on an as-needed basis, and reclaimed immediately when finished.  AR115.  The HCP also states that the proposed timbering will require fifteen to twenty log landings that might affect ten acres of land in total.  *Id.*  At this juncture, AWP is only required to provide "a complete description of the activity sought to be authorized." 50 C.F.R. 17.22(b)(1)(i). AWP has done just that. If FWS is asking AWP to identify the exact coordinates of each prospective skid trail and landing—some which may never materialize or, if they do, will be constructed years into the future—then FWS is asking for the impossible. But that may be the point.

*Formalistic Critique #2*

FWS asserts that AWP failed to include a description of the potential impact of "soil compaction" on the ground-dwelling salamander. AR63. Again, FWS's criticism is unfounded. Soil compaction is inherent throughout AWP's described

---

[4] "Skid trails are temporary, unsurfaced trails used to skid (i.e., drag) felled timber to log landings or haul roads for collection." AR115. "Log landings are cleared and graded areas where timber is concentrated for loadings onto trucks." *Id.*

activities. For example, AWP must grade the surface for log landings. AR115-16. AWP must also use bulldozers and excavators to build skid trails. *Id.* The HCP thoroughly describes the impact of those activities, including the impact of soil compaction. *See, e.g.,* AR160 (explaining that threatened species might be impacted "as a result of surface grading or skidding that changes the configuration or accessibility of subsurface crevices or voids"). At this juncture, AWP is only required to specify "the impact that will likely result from such taking." 50 C.F.R. 17.22(b)(1)(iii). AWP has done just that.

*Substantive Critiques #1-4*

The remaining four reasons given by FWS improperly critique the HCP's substantive and scientific conclusions. In particular, FWS disagrees with AWP's impact analysis concerning haul roads, *see* AR62-63 (Parts II.A.3 and II.B.2); activities that FWS claims are not properly deconstructed (FWS does not say which ones), *see id.* at 6 (Part II.B.1); and wintertime activities, *see id.* (Part II.B.3). Those are not form criticisms. Indeed, in challenging the measured take, FWS actually recognizes that AWP satisfied its burden of describing the likely take from those activities. FWS just disagrees with the substantive conclusions as to the quantitative extent of take. Those substantive criticisms are premature at the application intake stage.

FWS's substantive critiques draw on criteria found in 16 U.S.C. § 1536(a)(2) ("Section 7"), not 16 U.S.C. § 1539 (a)(2)(A) ("Section 10"). Not only does FWS borrow criteria from the incorrect section, FWS flips the burden of explanation on its head.

Under Section 7, FWS (not AWP) must prepare a biological opinion. 16 U.S.C. § 1536(b)(3)(A). In that biological opinion, FWS (not AWP) must ensure that the agency action is "not likely to jeopardize the continued existence of" a protected species. *See id.* at §1536(a)(2). And in doing so, FWS (not AWP) must use "the best scientific and commercial data available." *See id.* Section 1539(a)(2)(A) ("Section 10")—which imposes the criteria for statutory completion—imposes no such duties on AWP. Because "best available science" is not a Section 10 criterion—let alone a formalistic criterion under § 1539(a)(2)(A)—FWS's rejection of AWP's application as incomplete was wholly contrary to law.

### III.    FWS Ignores its Burden of Scientific Explanation

Not only are its substantive criticisms out of turn, but FWS is also critiquing analysis AWP was never required to provide. In doing so, FWS attempts to flip the burden of scientific explanation on its head: FWS is criticizing AWP's scientific conclusions when it should be the other way around.

Under Section 7, FWS must "make a prediction about effects and, if the agency cannot reject the null hypothesis (no jeopardy) as unlikely, then grant a license." *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, — F.4th —, 2023 WL 4036598, at *8 (D.C. Cir. June 16, 2023). This analysis, which is presented in the so-called "biological opinion," must be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).[5] Thus, if FWS chooses to deny AWP's permit under

---

[5] "This empirical mandate ensures the law is not implemented haphazardly, on the basis of speculation or surmise, and thus avoids needless economic dislocation produced by

Section 7, FWS must prepare a biological opinion explaining its reasoning. FWS must also suggest "reasonable and prudent alternatives" for satisfying Section 7. *Id*. at § 1536(b)(3)(A).

Under Section 10, FWS must, after opportunity for public comment, make express findings as to each of the four issuance criteria set forth in 16 U.S.C. § 1539(a)(2)(B). If FWS chooses to deny an application under Section 10, FWS must then make at least one of the following findings: (1) that the taking is *not* incidental to an otherwise lawful activity; (2) that the impacts are *not* minimized and mitigated to the maximum extent practicable, (3) that adequate funding for the plan will *not* be provided; and (4) that the taking *will* appreciably reduce the likelihood of survival and recovery of the species in the wild. *See* 16 U.S.C. § 1539(a)(2)(B).

To avoid showing its work, FWS has impermissibly attempted to place the onus of scientific explanation on AWP. The practical effect is that AWP is now left to defend its scientific analysis, whereas it should be the other way around. FWS should not be permitted to sidestep its burden and hide behind a 7-page letter that provides only generalized critiques and uncited references to the "best available science."

## IV.    FWS Acted in Bad Faith

Agency action taken in bad faith or for improper purposes is arbitrary and capricious by its very nature. *See In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 156 F.3d 1279, 1279–80 (D.C. Cir. 1998) ("The actual

---

agency officials zealously but unintelligently pursuing their environmental objectives." *Maine Lobstermen's Ass'n*, 2023 WL 4036598, at *8 (cleaned up).

subjective motivation of agency decisionmakers is immaterial unless there is a showing of bad faith or improper behavior.") (cleaned up); *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (explaining bad faith "would be material to determining whether the Government acted arbitrarily"); *In re U.S. Dep't of Educ.*, 25 F.4th 692, 703 (9th Cir. 2022) ("Bad faith is a requirement because when the agency has been dishonest, further judicial scrutiny is justified and, in fact, necessary to effectuate judicial review"). In other words, agency action based on bad faith or improper purposes violates the agency's "requirement to engage in reasoned decision making." *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015) (cleaned up). FWS's bad faith is manifest in at least two respects: unreasoned and contradictory criticisms, and delay.

**First**, though AWP could never explain in 25 pages the full extent FWS's unreasoned approach, FWS's behavior is best illustrated by the following criticisms:

- FWS challenged AWP's ability to enforce permit conditions on future residents through a proposed homeowner's association. SAR380. But in bemoaning this enforcement mechanism, FWS asked "How will a property owner(s) not interested in salamanders know how to identify covered salamanders?" and "How do you keep children from capturing salamanders and keeping them as pets?" *Id.* These concerns are facially ridiculous and beyond the scope of permissible considerations.

- AWP had long pursued a permit with a fifty-year term. AR7234 (HCP, Jan.1, 2008). However, eleven years later, in May 2019, FWS suggests

for the first time that AWP should consider shortening the permit duration to 30 years to account for "climate change," which FWS does not suggest is some new phenomenon. SAR749.

- At FWS's request, AWP prepared "effects matrixes," which are illustrative tools to *summarize* by way of diagram the impacts of various covered activities on the covered species. FWS provided specific examples (SAR694-739), in addition to the example in the HCP Handbook (p. 5-4). Though none of FWS's examples included citations (after all, these matrixes are merely illustrative summaries), FWS criticized AWP for not including specific citations to scientific literature. SAR418. AWP's effects matrixes go well beyond what was provided in FWS's own examples.

- In order to avoid any reasonably certain take of covered bats and salamanders, AWP agreed to limit all construction and timbering activities to the months of November 15 and March 15. AR161. During this period bats will be hibernating in caves, and the salamanders will be overwintering underground or in rocky crevices. *Id*. However, because the salamanders could *possibly* resurface during a warmer winter day, FWS demands that AWP both (1) limit covered activities to four months of the year, and (2) halt all covered activities if the daily temperature exceeds a certain threshold at any point during that four-month period. AR12-13. Not only are these restrictions wholly

22

impractical and overly burdensome, but such restrictions are also contrary to FWS's own precedent and guidance.[6]

**Second**, the administrative record is replete with instances of obvious delay and long periods of unexplained radio silence. *See supra*, STATEMENT OF FACTS. FWS's pattern of conduct, as well as the sheer length of time that has passed, shows that FWS acted in bad faith and with an improper purpose. Though FWS's own guidance suggest that the entire process should take only two years, FWS managed to string AWP along for nearly seventeen years. *See* HCP Handbook, at 2-1 (Hypothetical Timelines for HCPs). To make matters worse, at the end of that seventeen-year effort, FWS never actually reached the merits of the proposed take vis-à-vis a biological opinion, which should have been prepared concurrently with the drafting of the HCP. HCP Handbook, 14-7, 14-24, 14-30, and 15-5. Instead—and only after FWS was forced to file a lawsuit for unreasonable delay—FWS denied AWP's application on the dubious basis that its application was statutorily incomplete.

Other courts have found strong showings of bad faith and improper behavior under less egregious circumstances than what is described above. In *Tummino v. Von Eschenbach*, the district court held that a delay of five years—far less than the nearly seventeen years in this case—"*alone* raise[d] questions about the good faith of the

---

[6] As recently as November 2020, FWS released a Biological Opinion, which stated, "as with most woodland salamanders, the Cheat Mountain salamander shows consistent patterns of daily and seasonal activities." Continuing, these salamanders "generally over-winter under the surface and emerge to forage and breed in early spring, March to April" and "remain on the surface into mid-October."

*See* https://ecos.fws.gov/tails/pub/document/18027481 (p. 10) (last visited June 28, 2023).

[federal agency]." 427 F. Supp. 2d 212, 232 (E.D.N.Y. 2006) (emphasis added). What's more, in *Tummino* the district court found that the timeline "strongly suggest[ed] that the delay [was a calculated 'filibuster' designed to avoid making a decision" because, just like the FWS, the federal agency repeatedly flouted its own internal deadlines and legal requirements and continually moved the goalposts of what it needed for a decision. *Id.* Similarly, in *Sun Il Yoo v. I.N.S.*, the Ninth Circuit could find "no apparent justification" for a federal agency's "unreasonable delay" of only one year when "the [federal agency] acquired no new data" during that time. 534 F.2d 1325, 1328 (9th Cir. 1976). The Ninth Circuit concluded that "[s]uch conduct"— reminiscent of the yearslong periods of radio silence from FWS—"fully merits the characterization of 'oppressive.'" *Id.* Likewise, in *Sokaogon Chippewa Community v. Babbitt*, the district court reasoned that a federal agency acted with *prima facie* improper purposes because of a mere six-week delay in contacting the plaintiffs with new information, "especially considering [the agency's] duty to consult with plaintiffs." 961 F. Supp. 1276, 1282 (W.D. Wisc. 1997). Lastly, in *In re U.S. Department of Education*, the Ninth Circuit upheld a district court's finding of bad faith where the federal agency issued "unreasoned form letters" denying administrative claims "despite having previously claimed that the eighteen-month delay in deciding [the claims] was due, in part, to the time-intensive process of considered decision making." 25 F.4th at 703.

Each case above involved less delay and less "filibustering" than what AWP endured here. And the court in each case readily concluded that the plaintiffs had

24

made strong showings of bad faith and improper behavior by the respective federal agencies. Likewise, the record in this case—immense delay, radio silence, backtracking, and goalpost moving—demonstrates that FWS based its decision not on concern over application completeness, but on a desire to never let AWP's application off the ground. That constitutes independent cause to set aside FWS's decision as arbitrary and capricious.

<u>CONCLUSION</u>

FWS has strung AWP along for nearly seventeen years in a never-ending effort to merely submit a permit application. In classical antiquity, Hades subjected Sisyphus to the eternal torture of rolling a boulder up a hill, only to send the boulder back to the bottom to start again. In modern America, FWS has learned that this Sisyphean exercise is called the federal bureaucratic state.

FWS's rejection of AWP's application, as set forth in the October 17, 2022 letter (AR59-65), was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  As a result, this Court should (1) set aside that decision, (2) declare that AWP's application is statutorily complete pursuant to 16 U.S.C. § 1539(a)(2)(A), (3) compel FWS to provide public notice of AWP's application in the Federal Register pursuant to 16 U.S.C. § 1539(c), (4) retain jurisdiction of this case until final agency disposition of the pending application as a whole; and (5) award AWP its fees and expenses pursuant to 28 U.S.C. § 2412.

**ALLEGHENY WOOD PRODUCTS, INC.**

By Counsel:


/s/ Andrew C. Robey
Isaac R. Forman (WVSB #11668)
Andrew C. Robey (WVSB #12806)
Carl W. Shaffer (WVSB #13260)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
t: 681-265-3802
f: 304-982-8056
iforman@hfdrlaw.com
arobey@hfdrlaw.com
cshaffer@hfdrlaw.com

## **CERTIFICATE OF SERVICE**

I certify that on June 30, 2023, I filed the foregoing via the CM/ECF system, and the foregoing document was served on all counsel of record through the CM/ECF system.

/s/ Andrew C. Robey
Andrew C. Robey (WVSB #12806)