**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

ALLEGHENY WOOD PRODUCTS, INC.,   )
                                         )
              Plaintiff,        )
                                         )
      v.                     )
                                       )   Civil Action No. 2:22-cv-07 (Kleeh)
UNITED STATES FISH AND WILDLIFE   )
SERVICE, et al.,               )
                                        )
            Defendants.     )
                                         )

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

## INTRODUCTION

Blackwater Canyon ("the Canyon") is a narrow, deep canyon that stretches through Tucker County, West Virginia, in the Central Appalachian Mountain Range. AR-329. Protected lands like the Monongahela National Forest, Canaan Valley National Wildlife Refuge, and Blackwater Falls State Park cover much of the area in or near the Canyon. AR-329–31. The Canyon is also home to species protected by the Endangered Species Act ("ESA"), including the Indiana bat (endangered under the ESA, *see* 32 Fed. Reg. 4001), northern long-eared bat (endangered under the ESA, *see* 87 Fed. Reg. 73,488), Cheat Mountain salamander ("CM salamander") (threatened under the ESA, *see* 54 Fed. Reg. 34,464), and many species that may become protected, like the green salamander, big brown bat, little brown bat, and tri-colored bat. AR-349. The Canyon was logged and burned in the early 1900s, and the region was intensively mined for coal during the 20th century. AR-7645–46. Many areas of the Canyon are still recovering. *Id.*

The ESA allows private persons interested in pursuing economic activities such as logging and residential development in places like the Canyon that have ESA-protected species to apply for an incidental take permit ("ITP"). An ITP provides limited exemptions from the ESA's general prohibition against "take" of listed species. An ITP applicant must prepare and submit a document to the relevant wildlife agency—here the U.S. Fish and Wildlife Service ("FWS")—called a habitat conservation plan ("HCP"), which includes critical details about the proposed project. Without this information, FWS cannot adequately perform the analyses necessary to issue an ITP. The HCP process is meant to be a cooperative endeavor between the government and ITP applicant. In this spirit of partnership, FWS generally works closely with the applicant to develop the HCP until the document is complete. But in unusual cases, despite the agency's efforts to collaborate, an applicant may submit an HCP without all the information required by the ESA and its implementing regulations. In those instances, the HCP is considered incomplete, and FWS cannot

1

process the ITP application. But the applicant always has the option to address the deficiencies in the HCP for FWS to reconsider.

Plaintiff Allegheny Wood Products, Inc. has resisted the HCP process from the outset of its timber harvest and housing development project. Indeed, Plaintiff only began the permitting process after it faced the threat of suit for its refusal to apply for an ITP. Despite Plaintiff's non-cooperation, FWS has consistently tried to work with Plaintiff to allow the project to go forward and develop a legally defensible HCP. The agency only stopped processing Plaintiff's ITP application when Plaintiff refused to address the deficiencies in the HCP that FWS advised it about for years. Now, Plaintiff challenges FWS's finding that Plaintiff's HCP for its proposed project is incomplete. While it took time for FWS to finally halt its efforts to collaborate with Plaintiff, the decision was not made in bad faith, but because Plaintiff repeatedly refused to provide the information FWS needed to move forward with the ITP application process.

Thus, the Court should grant Defendants' cross-motion for summary judgment and deny Plaintiff's motion for summary judgment (ECF No. 41).

## LEGAL BACKGROUND

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).[1] ESA Section 4 directs the Secretaries of the Interior and Commerce[2] to determine whether a

---

[1] The ESA defines an "endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range," *id*. § 1532(6), and a "threatened species" as one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id*. § 1532(20).

[2] The Secretary of the Interior ("Secretary"), acting through FWS, is generally responsible for all terrestrial and freshwater species, including the species here.

particular species should be listed as "endangered" or "threatened," *id*. § 1533(a)(1), and to designate "critical habitat" for listed species, *id*. § 1533(a)(3)(A)(i).

Once listed, ESA Section 9 prohibits the unauthorized "take" of an endangered species. *Id*. § 1538(a)(1)(B). FWS extended that prohibition to the threatened species at issue in this litigation. 54 Fed. Reg. at 34,467. "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). FWS has further defined "harm" to include "significant habitat modification or degradation" that "actually kills or injures wildlife." 50 C.F.R. § 17.3.

Although take is generally prohibited, ESA Section 10 exempts "incidental" take: a taking that "is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Issuing an ITP that allows for a take exemption occurs in four phases.

In Phase 1, an applicant seeking an ITP meets informally with FWS to decide whether an ITP is appropriate and, if so, what type and scale of HCP would best fit the applicant's project. HCP Handbook Ch. 2.1.[3] In Phase 2, the applicant submits an HCP, which must specify:

> (i) the impact which will likely result from such taking;
>
> (ii) what steps the applicant will take to minimize and mitigate such impacts, and the funding that will be available to implement such steps;
>
> (iii) what alternative actions to such taking the applicant considered and the reasons why such alternatives are not being utilized; and
>
> (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan.

16 U.S.C. § 1539(a)(2)(A); *see also* 50 C.F.R. §§ 17.22(b)(1), 17.32(b)(1). As part of the ITP

---

[3] The HCP Handbook is a guidance document that serves as an instructional aid for FWS and ITP applicants. HCP Handbook at i, https://www.fws.gov/sites/default/files/documents/habitat-conservation-planning-handbook-entire_0.pdf (last visited Aug. 16, 2023).

application, the applicant must also submit a complete description of the activity it seeks to have authorized. 50 C.F.R. §§ 17.22(b)(1)(i), 17.32(b)(1)(i). Once FWS finds that the HCP is statutorily complete and certifies it as such, then the applicant is instructed to submit its ITP application package for review. HCP Handbook at 14-11.

Phase 3 begins only after FWS determines it has a complete application package. FWS prepares draft analyses of the proposed project's effects under the National Environmental Policy Act ("NEPA") and National Historic Preservation Act ("NHPA"). *See* 42 U.S.C. § 4321 *et seq.*; Section 1 of NHPA, Pub. L. No. 89-665, 80 Stat. 915 (1966), *as amended by* Pub. L. No. 96-515, 94 Stat. 2987 (1980). Then FWS publishes notice in the Federal Register and provides the public with at least 30 days to comment on the HCP, NEPA document, and NHPA plan. *See* 16 U.S.C. § 1539(a)(2)(B); 50 C.F.R. §§ 17.22, 17.32(b)(1)(ii). Before issuing the ITP, FWS must also consult on the ITP's effects under Section 7 of the ESA, relying on the facts provided in the HCP. 16 U.S.C. § 1536. After reviewing the public's comments and performing the above analyses, if FWS finds that the HCP complies with NEPA, NHPA, ESA Section 7, and ESA Section 10(a)(2)(B),[4] then "the Secretary shall issue the permit." 16 U.S.C. § 1539(a)(2)(B). Finally, during Phase 4, the project and the HCP are implemented. HCP Handbook Ch. 2.1.

If, however, the application is not complete, FWS cannot proceed to Phase 3 of the ITP process. *Id.* § 1539(a)(2)(A); 50 C.F.R. §§ 17.22(b)(2)(i), 17.32(b)(2)(i). An application is considered incomplete if an applicant submits an HCP that does not meet the statutorily required elements of Section 10(a)(2)(A) or its implementing regulations. 16 U.S.C. § 1539(a)(2)(A)

---

[4] ESA Section 10(a)(2)(B) requires FWS to issue an ITP if it finds that (i) the taking will be incidental; (ii) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (iii) the applicant will ensure that adequate funding for the plan will be provided; (iv) the taking will not appreciably reduce the likelihood of survival and recovery of the species in the wild; and (v) other required measures will be met. 16 U.S.C. § 1539(a)(2)(B).

(stating that "[n]o permit may be issued" unless the applicant submits an HCP that meets the ESA's statutory requirements); 50 C.F.R. §§ 17.22(b)(2)(i), 17.32(b)(2)(i); HCP Handbook Ch. 14.3.4. If FWS finds that a draft HCP is incomplete, then the agency explains the HCP's inadequacies to the applicant and requests that the applicant revise the HCP accordingly. HCP Handbook Ch. 14.3.4. But if FWS finds it unlikely that the draft HCP will meet the ESA's requirements, then the agency notifies the applicant and explains why it reached that conclusion. *Id.*

## FACTUAL BACKGROUND

### I.    Plaintiff's Initial Reluctance to Engage in the ITP Process: 1997 to 2000

Plaintiff is a timber corporation of about 500 employees that operates in multiple states. AR-7645. It acquired a 2,764-acre plot of land on Blackwater Canyon's south slope and the lower part of its north slope in the 1990s intending to harvest it for timber and potentially build a housing development. AR-332, 9293.

In 1997, FWS notified Plaintiff about the presence of at least two ESA-listed species on the property and recommended that Plaintiff arrange for field review before beginning any timber harvests. AR-9305–08. Plaintiff began logging without conducting any such review, and in 1998 environmental groups notified Plaintiff that they intended to sue for violations of the ESA. AR-9292–301. FWS warned Plaintiff that the areas it had harvested could be CM salamander habitat and recommended that Plaintiff avoid ESA-take liability for the salamander and other protected species by applying for an ITP. AR-9229–32. Plaintiff initially did not commit to applying for an ITP. AR-9285–89. But Plaintiff eventually entered into a settlement agreement with the environmental groups that required Plaintiff to discuss its ESA obligations with FWS. AR-9080–83, 9225–28, 9099–102. Also during this time, FWS worked with Plaintiff on a timber harvest for a 350-acre portion of the Blackwater Canyon property, which Plaintiff successfully carried out in compliance with the ESA. *See* AR-8851–54, 8436.

## II.        The Beginnings of the HCP: 2000 to 2015

After meeting with FWS for several years, AR-7982, 8111; SAR-1338, 1356, 1379–85, Plaintiff submitted its first draft HCP in December 2005, SAR-1160–230. FWS met with Plaintiff the next month to give feedback on the draft, and there was "considerable discussion" about the draft's one-page description of the project's effects. SAR-1148–56; *see* SAR-1286–87. Plaintiff did not submit another draft HCP for two years. AR-7216.[5] Once FWS received this subsequent draft HCP, it met with Plaintiff the next month and volunteered to draft parts of the HCP for Plaintiff. AR-7203–05, 7199–201. Notably, Plaintiff proposed excluding almost half the lands in the Blackwater Canyon tract from the HCP. AR-5127.

In February 2008, Plaintiff notified FWS that it intended to begin harvesting timber in part of the Blackwater Canyon. AR-7207. Plaintiff began the logging a month later without confirmation from FWS that the logging complied with the ESA. AR-7176–78. While FWS considered if the logging was ESA-compliant and reviewed several other draft HCPs submitted by Plaintiff, AR-7127, 7423–642 (July 2008 draft), 6428–653 (October 2008 draft), Plaintiff told FWS that it intended to conduct another timber harvest. AR-6205. FWS warned Plaintiff that it was concerned about Plaintiff's exclusion of lands from the HCP and began working with Plaintiff on timber prescriptions for the harvest to avoid indirect take of any bats present on the property. AR-5502, 5127. FWS also noted that Plaintiff "made few changes" to the draft HCP in response to the agency's previous substantive comments, and that FWS had "major concerns about the anticipated levels of take, effects analysis, and the adequacy of proposed avoidance/minimization/ mitigation measures," particularly for the CM salamander. AR-5219.

---

[5] In the meantime, FWS worked on an ESA Section 7 consultation for an access easement to the Blackwater Canyon property that Plaintiff applied for through the U.S. Forest Service. *See, e.g.*, AR-7735–36.

In November 2009, without FWS's knowledge, Plaintiff resumed logging. AR-5127. After finding out about the harvest, FWS again notified Plaintiff about potential take and told Plaintiff that it could not determine whether the logging was ESA-compliant without more information, including a complete description of the activities Plaintiff intended to carry out and Plaintiff's efforts to search for caves that bats may inhabit. AR-5127–29. Plaintiff claimed to have conducted extensive surveys of the property without finding any caves. AR-5093. FWS noted that none of Plaintiff's efforts focused on cave searches and two weeks later told Plaintiff that records suggested the presence of at least three caves on the Blackwater Canyon property. AR-5055–57. But that did not stop Plaintiff from resuming logging a month later, again without notifying FWS. AR-4993, 5007. And because Plaintiff refused to provide the information that FWS repeatedly requested, FWS could not determine the likelihood of take from Plaintiff's activities. AR-4757. As the multiple threats to sue sent by environmental groups throughout this time demonstrated, Plaintiff's actions left both itself and FWS vulnerable to suit. *See* AR-7128, 4816.

Despite Plaintiff's furtive behavior, FWS continued to work with Plaintiff on the HCP in 2011 and 2012. *See, e.g.*, AR-4598, 4426. Then in March 2013, Plaintiff submitted a 12-page draft HCP: a far cry from meeting the ESA's requirements and a drastic departure from the 225-page draft HCP submitted in October 2008. AR-4400–12; *see* AR-6428–653. In light of the many outstanding issues and significant deficiencies that plagued the 2013 draft of the HCP, the other projects and litigation on FWS's docket, and Plaintiff's consistent failure to cooperate, the agency focused its limited resources on addressing other competing priorities. AR-4344–46. FWS kept Plaintiff informed about its staff constraints during this time. *See* AR-4382, 4366, 4345.

## III.    The HCP Process: 2015 to 2022

Once it had the capacity to do so, FWS turned its attention back to the Blackwater Canyon HCP in 2015, assigning a staff biologist from the New York Field Office to assist Plaintiff with

the document. AR-4345. FWS met with Plaintiff in February 2016 to discuss the latest draft and told Plaintiff that the HCP needed to describe the adverse effects from the proposed activities, how those effects could be avoided, and the ESA take associated with the activities. AR-4302–05. FWS then provided Plaintiff with detailed comments on the draft, noting that Plaintiff needed to include other project impacts like soil compaction from equipment and add a take analysis. SAR-1018, 1022.

Plaintiff submitted another draft HCP in June 2016 before hiring a consultant to continue working on the document. SAR-900–1007; AR-3918–20. Plaintiff did not submit another draft HCP to FWS until the next summer, and FWS met with Plaintiff a month after receiving it. SAR-762–892; AR-3858. The HCP still needed a lot of work, *see* AR-3814, and FWS's West Virginia Field Office had to turn to other ITP applications and a Freedom of Information Act ("FOIA") request for information on over 80 mining projects. AR-3801–06. At the end of 2017, before receiving comments on the 2017 draft HCP, Plaintiff submitted an ITP application. AR-3838–56.

Several days later, environmental groups submitted a letter with preliminary comments on a draft of the HCP obtained through a FOIA request, many of which echoed comments previously given by FWS. AR-3815–36. For example, FWS had noted that the HCP did not adequately address habitat fragmentation from the construction of skid trails and logging roads, a concern that the environmental groups' letter also raised. AR-3919, 3824.

In early 2019, FWS continued working on the Blackwater Canyon HCP.[6] SAR-754. FWS provided detailed comments on the draft HCP to Plaintiff, again noting that the HCP did not

---

[6] On February 5, 2019, West Virginia Field Office FWS employee Chase Allred reached out to Regional HCP Coordinator Kevin Connally to ask for assistance on the Blackwater Canyon HCP. AR-3801. Mr. Connally stated that he was busy with other obligations for the next 10 days, but that he could meet with Mr. Allred after February 19. *Id.* Plaintiff mischaracterizes this exchange. ECF No. 42 at 6.

provide sufficient descriptions of the proposed activities' environmental effects. SAR-745–47. Throughout 2019 and 2020, FWS met with Plaintiff around every two weeks at FWS's suggestion, AR-3699, providing feedback as the HCP's drafting continued, giving Plaintiff examples of sufficient analyses, and consistently telling Plaintiff that it needed to include more specifics about the project's effects. *See, e.g.*, AR-3771, 3755, 3645–47, 1818.[7]

Finally, when it became clear that Plaintiff either did not understand the level of detail required for the HCP or refused to provide it, FWS drafted a 22-page single-spaced document outlining the issues with the HCP and a 45-page document to model how to approach accounting for the likely take of species and mitigating the effects of the proposed activities. AR-1471–537. FWS used the CM salamander as the model species with the hopes that Plaintiff would incorporate the analysis into the next draft HCP and use the example to complete the analyses for the other species that Plaintiff sought coverage for in the ITP. AR-1471. But Plaintiff refused to do so, claiming that the "effects analysis is content that [FWS] would need to prepare for its Biological Opinion anyway." AR-1046. While Plaintiff did make some changes to the take calculations, FWS explained why they did not sufficiently address previously raised concerns and suggested how Plaintiff could do so. AR-1002–11. After FWS provided this technical assistance, Plaintiff sent four separate memoranda disagreeing with the expert agency's suggestions. AR-662–77, 864–906. Then in December 2021, Plaintiff submitted an ITP application with what it declared was the "Final Draft" HCP for FWS's consideration. AR-860–61.

---

[7] Plaintiff contends that FWS orally acknowledged that a 2020 draft version of the HCP was ready for regional office review, citing an email written by its contractor months after the meeting happened. ECF No. 42 at 7; *see* AR-3137. But a memorandum written by FWS the day after Plaintiff's email clarifies that FWS still considered the project to be in the HCP development phase. AR-3115. And an email from the contractor sent the same day as the meeting says that FWS had "what [*Plaintiff*] considers to be a final draft HCP." AR-3155 (emphasis added).

## IV.     FWS's Finding

In October 2022, FWS found that Plaintiff's HCP was incomplete because it did not meet the ESA's statutory requirements. AR-59–65. The agency noted that this finding was "unusual" because FWS typically works with an applicant until the HCP's completion or the applicant stops pursuing an ITP. AR-59. But FWS issued this finding because Plaintiff stated that the December 2021 HCP was the final draft that it would provide. AR-59; *see* AR-860.

FWS identified two foundational issues with the HCP. First, the HCP did not describe the activities for which Plaintiff seeks ESA coverage, or the impacts of those activities, with enough detail to allow FWS to analyze the Project's effects on species. AR-62–63. Because the HCP addresses species like salamanders and bats, Plaintiff needed to provide a breakdown of the project activities and their effects at a scale appropriate for analyzing those species. AR-62. For example, the HCP acknowledges that the use of heavy machinery for logging activities could cause soil compaction, but it does not discuss the long-term effects that soil compaction could have on ground-dwelling species like the CM salamander. AR-63. Plaintiff failed to complete this analysis despite FWS repeatedly notifying Plaintiff of the deficiency. AR-62. Second, the HCP does not adequately account for potential take reasonably certain to occur from Project activities. AR-63–65. Because the HCP does not describe the Project activities or their effects with appropriate detail, the HCP likely underrepresents the Project's potential for species take (like long-term take from soil compaction). AR-64. And Plaintiff refused to address some impacts that FWS repeatedly explained would likely cause take. For example, the HCP does not account for take from all effects or activities that disturb the leaf litter or soil. *Id.*

Without the information described above, the HCP did not sufficiently specify the impacts that will likely result from species take caused by the Project. AR-65; *see* 16 U.S.C. 1539(a)(2)(A)(i). Nor could Plaintiff specify how it would mitigate impacts it had not addressed,

fund that mitigation, or adequately discuss alternatives to the Project's actions. AR-65; *see* 16 U.S.C. § 1539(a)(2)(A)(ii)–(iii). Thus, FWS found the HCP did not meet the requirements of the ESA and its implementing regulations and was incomplete. AR-65.

## STANDARD OF REVIEW

Claims challenging federal agency action under the ESA are reviewed using the standard of review in the Administrative Procedure Act ("APA"). *Red Wolf Coal. v. FWS*, 210 F. Supp. 3d 796, 802 (E.D.N.C. 2016) (citing *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 316 (4th Cir. 1988)); *see* 5 U.S.C. § 702. Under the APA, a court may set aside "agency action" that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under this standard is "highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citation omitted). An agency "is owed particular deference when exercising its judgment in resolving factual disputes that 'implicate substantial agency expertise' and that require the agency to 'balance often-competing interests.'" *Nat'l Audubon Soc'y v. U.S. Army Corps of Eng'rs*, 991 F.3d 577, 583 (4th Cir. 2021) (citation omitted). "[S]o long as the agency provides an explanation of its decision that includes a rational connection between the facts found and the choice made, its decision should be sustained." *Id.* (citation omitted).

When reviewing an agency decision, courts "consider the [administrative] record made before the agency at the time the agency acted." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467–68 (4th Cir. 2013) (citation omitted). Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" from the administrative record. *Bowman Transp. v. Ark.-Best Freight Sys.*, 419 U.S. 281, 285–86 (1974) (citation omitted).

Motions for summary judgment under Federal Rule of Civil Procedure 56 are the appropriate mechanisms to review agency decisions under the APA. *See, e.g.*, *Nat'l Audubon Soc'y*

*v. U.S. Army Corps of Eng'rs*, 420 F. Supp. 3d 409, 420–21 (E.D.N.C. 2019), *aff'd*, 991 F.3d 577. In APA cases, a court reviewing motions for summary judgment "does not resolve factual questions, but instead determines 'whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Ohio Valley Env't Coal. v. Hurst*, 604 F. Supp. 2d 860, 879 (S.D. W.Va. 2009) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)). Thus, in an APA claim, "summary judgment becomes the 'mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review.'" *Id.*

## ARGUMENT

### I.  FWS Has Discretion to Decide If an HCP Is Complete.

The statutory framework for permitting otherwise prohibited take of ESA-protected species gives FWS discretion to determine whether an HCP meets the requirements of ESA Section 10(a)(2)(A) and its implementing regulations, and thus whether it can move forward in the ITP application process. *See* 16 U.S.C. § 1539(a)(2)(A). The ESA, its regulations, and the HCP Handbook all contemplate FWS having discretion to determine whether an HCP meets the Section 10(a)(2)(A) requirements before processing an ITP application. And the ITP process itself shows why an applicant must provide the information required by those provisions at the HCP-development phase. Conversely, Plaintiff cites no support for its novel—and incorrect—interpretation that the critical information provided through the requirements of Section 10(a)(2)(A) and its implementing regulations amounts only to a formalistic box-checking exercise. Thus, Plaintiff's attempts to bulldoze its application through to the next phase of the application process, by incorrectly characterizing the ESA's requirements and dismissing FWS's well-reasoned approach to reviewing HCPs, should not sway the Court.

**A.  The ESA and its implementing regulations support FWS's discretion.**

Three distinct provisions in the ESA and its implementing regulations demonstrate that FWS has discretion to decide whether an HCP meets the ESA's statutory and regulatory requirements: ESA Section 10(a)(2)(A)(iv), Section 10(a)(2)(A)(i), and 50 C.F.R. Sections 17.22(b)(1)(i) and 17.32(b)(1)(iii).

First, Section 10(a)(2)(A)(iv) explicitly incorporates the agency's substantive position on what information should be in an HCP, stating that the applicant must include "other measures that [FWS] may require as being necessary or appropriate for purposes of the plan." *Id.* § 1539(a)(2)(A)(iv) (emphasis added). As other courts have found, this language shows FWS's discretionary authority over the parameters of the Section 10(a)(2)(A) requirements. *See Leander Indep. Sch. Dist. v. U.S. Dep't of the Interior*, No. 1:22-CV-310-RP, 2022 WL 19300727, at *5 (Dec. 21, 2022) ("The ESA provides [FWS] authority to impose 'such other measures . . . necessary or appropriate for purposes of the plan.'" (quoting 16 U.S.C. § 1539(a)(2)(A)(iv))), *report and recommendation adopted*, 2023 WL 2706745 (W.D. Tex. Mar. 29, 2023).

Second, Section 10(a)(2)(A)(i) envisions expert-agency input on an HCP. The applicant must include "the impact which will likely result" from take permitted by an ITP. *Id.* § 1539(a)(2)(A)(i). This provision does not include language that allows for exclusive applicant discretion, like "the impact that the applicant thinks will likely result from take." Instead, as the HCP Handbook details, FWS works with the applicant to "come to agreement on the causes and forms of take associated with covered activities." HCP Handbook at 8-7–8-8.

Third, the ESA's regulations require an applicant to submit a "completed" application, including a "complete description of the activity sought to be authorized" with its application. 50 C.F.R. §§ 17.22(b)(2), 17.22(b)(1)(i), 17.32(b)(2), 17.32(b)(1)(iii)(a) (emphasis added). The regulation's use of "complete"—rather than just requiring a description—paired with the use of

"completed" application indicates that the agency, not the applicant, must decide whether the application describes the project activities to the point of being "complete." *See United States v. Joshua*, 607 F.3d 379, 385 (4th Cir. 2010) ("[W]e are obligated to interpret statutory language so that every word possesses a coherent, unabsurd meaning.") (citation omitted).

Nor do the cases that Plaintiff cites support its position. Plaintiff mischaracterizes *Loggerhead Turtle v. County Council of Volusia County*, 120 F. Supp. 2d 1005 (M.D. Fla. 2000), which details the broad discretion that the ESA vests in FWS to issue ITPs. *Id.* at 1019. There, FWS found that the HCP was complete and issued an ITP. *Id.* Contrary to Plaintiff's contentions, this case supports that to withstand APA review, FWS must ensure that the HCP includes a "thorough analysis" of the permitted activities and the take they will likely cause. *Id.* Similarly, in *National Wildlife Federation v. Babbitt*, 128 F. Supp. 2d 1274 (E.D. Cal. 2000), the court upheld FWS's finding that the HCP sufficiently described the impacts to two listed species that would likely result from allowing development in a Sacramento Valley basin. *Id.* at 1291. Both cases show that approving an HCP as complete is a substantive, discretionary decision by FWS, and neither supports Plaintiff's characterization of the Section 10(a)(2)(A) requirements as merely formalistic.

The text of the ESA and its implementing regulations show that FWS finding that an HCP is complete is not a formalistic exercise but a substantive determination by the agency. And, as discussed below, the ESA allows FWS to make such a determination when deciding whether to process an ITP application.

### B.  FWS properly decides whether an HCP is complete in Phase 2 of the ITP process.

Consistent with FWS's exercise of discretion, the ESA also prohibits FWS from issuing an ITP before the applicant submits an HCP that meets the requirements of Section 10(a)(2)(A). 16 U.S.C. § 1539(a)(2)(A). The ESA's implementing regulations and the HCP Handbook clarify that FWS properly determines whether an HCP meets the relevant requirements at the second stage of

the ITP process: when deciding whether an ITP application is complete. 50 C.F.R. §§ 17.22(b)(2)(i), 17.32(b)(2)(i); *see* HCP Handbook at 14-9 (noting that FWS begins processing an ITP application after it gets "an adequate draft HCP that meets all requirements"). The application is submitted to the appropriate FWS field office, which must certify that the HCP is statutorily complete before submitting the package to the regional office for review. HCP Handbook at 14.3.5. The field office certifies that it reviewed the HCP and believes it is statutorily complete and otherwise meets regulatory and policy requirements for an ITP application. *Id.* Only after FWS makes this finding does the application proceed onto the next steps, like public notice and comment on the HCP and the ESA Section 7 consultation. 16 U.S.C. § 1539(a)(2)(B); 50 C.F.R. §§ 17.22(b)(2), 17.32(b)(2). Courts agree that FWS has the discretion to determine whether an HCP is complete at this stage of the ITP process. *Leander*, 2022 WL 19300727, at *5 (holding that plaintiff had not submitted a complete ITP application because FWS found that the HCP did not fulfill ESA Section 10(a)(2)(A)(iv)).

And determining whether an HCP is complete early in the ITP process makes good sense. Issuing an ITP requires FWS to (1) decide whether issuing the ITP will meet the requirements of ESA Section 10(a)(2)(B); (2) conduct an ESA Section 7 consultation on its issuance of the ITP; and (3) conduct a NEPA and NHPA analysis of the proposed project's effects. These analyses all require detailed project information, and FWS cannot adequately render them without sufficient details that only the applicant can provide in an HCP.

For example, ESA Section 10(a)(2)(B) requires FWS to determine that the taking from the proposed project "will be incidental," "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking," and "the applicant will ensure that adequate funding for the plan will be provided." 16 U.S.C. § 1539(a)(2)(B)(i)–(iii). But without a complete

description of the activities that the applicant intends to pursue, FWS cannot assess how much take of species will likely occur because of those activities. And without knowing the full, likely extent of the take, FWS cannot determine whether the mitigation measures proposed in the HCP to protect the species will minimize the impacts of take to the maximum extent practicable. And without knowing if the mitigation measures proposed by the applicant are sufficient, FWS cannot decide whether the applicant has ensured that it will provide adequate funding to implement the HCP.

Similarly, to consult under Section 7 of the ESA to determine whether permitting the project will likely jeopardize any ESA-listed species or adversely modify critical habitat, FWS must know with sufficient detail what the proposed activities are and what mitigation measures are feasible for the applicant. *See* 16 U.S.C. § 1536(a)(2). And the description of the proposed project in the HCP provides the basis for FWS's reviews under NEPA and NHPA. HCP Handbook at 3-29, 13-4. Because these analyses rely entirely on the information provided by the applicant, the HCP Handbook encourages FWS to "provide technical assistance to the applicant early in the process to guide the development of the HCP." *Id.* at 14-30.[8]

Plaintiff, to try and shirk its statutory and regulatory responsibilities, incorrectly suggests that FWS can clarify the HCP's factual deficiencies through the ESA Section 7 consultation process. ECF No. 42 at 14. But neither Section 7 nor Section 10 of the ESA allow FWS to unilaterally make the types of changes necessary to complete Plaintiff's HCP. Thus, allowing an HCP that FWS knows will not sufficiently inform later necessary analyses to proceed to the next

---

[8] Plaintiff confuses the technical assistance that FWS provided it with in this case as an attempt to substitute the standards of Section 10(a)(2)(B) and Section 7 for those of Section 10(a)(2)(A). *See* ECF No. 42 at 18– 20. FWS did not "borrow" the criteria from Section 7 or Section 10(a)(2)(B) to decide that Plaintiff's HCP is incomplete. Instead, FWS explained that the HCP must "provide enough information about an applicant's proposed activities to enable [FWS] to understand and adequately analyze the anticipated take," and concluded that Plaintiff did not do so. AR-61, 65. When FWS referenced the standards in Section 7 or Section 10(a)(2)(B) when giving Plaintiff feedback, it did so to explain why the information provided in the HCP was insufficient for FWS to adequately conduct those analyses. *See, e.g.*, SAR-745.

phase of the application process would preclude or delay any issuance of an ITP, require FWS to divert more of its limited resources to the ITP process, and waste the public's time and energy.

During Section 7 consultation, FWS can add mitigation as an applicant-binding term in its ITP by requiring as a term of its Section 7 incidental take statement[9] "reasonable and prudent measures" necessary or appropriate to minimize the impact of issuing the ITP. 16 U.S.C. § 1536(b)(4)(ii). However, the ESA's implementing regulations clarify that these reasonable and prudent measures "cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. § 402.14(i)(2). The information that FWS has repeatedly requested from Plaintiff—a more detailed breakdown of the project's activities and more accurate assessment of the likely take (including using temperature instead of strict dates to predict salamander presence)—could very well require altering the basic design, location, duration, or timing of Plaintiff's project. So even if FWS somehow obtained the requisite information later in the ITP process, the agency likely could not add any necessary mitigation through a term in the Section 7 incidental take statement and ITP. Instead, revising the HCP would likely be required.

As far as changes to an HCP during Phase 3 of the ITP process, at bottom, an "HCP is the applicant's document." HCP Handbook at 2-14. FWS cannot modify an HCP during this phase of the ITP process. Instead, FWS notifies the applicant of any deficiencies that come to its attention, gives guidance on how to resolve them, and makes clear that the applicant is responsible for responding to the identified issues, including by revising the HCP. *Id.* at 14-10. If the applicant will not revise the deficient application, then FWS cannot issue an ITP. *Id.* Thus, FWS cannot unilaterally "fix" a deficient HCP later in the ITP process and must continue to rely on an

---

[9] An incidental take statement is issued with a biological opinion and authorizes incidental take by the federal agency for the consulted-on action. 16 U.S.C. § 1536(b)(4).

applicant's cooperation. And even if Plaintiff cooperated with FWS during Phase 3 and agreed to revise its deficient application, the types of revisions necessary would likely require another round of public notice and comment once completed. *Cf.* HCP Handbook at 17-7 ("The types of activities that require permit amendment, and publication in the *Federal Register* include, but are not limited to: . . . increased level or different form of take for covered species, changes to funding that affect the ability of the permittee to implement the HCP, changes to covered activities not previously addressed, . . . changes to mitigation measures.").

In sum, the ESA gives FWS the discretion to decide whether an HCP meets the requirements of ESA Section 10(a)(2)(A) when evaluating the completeness of an ITP application. While Plaintiff contends, without any support, that completing an HCP is a mere box-checking exercise, the ESA, its implementing regulations, and the structure of the Section 10 program show that FWS lawfully exercises its authority by determining whether an HCP is complete before beginning Phase 3 of the ITP process. Plaintiff's misguided attempts to move its deficient HCP onto the next stage would only slow down any issuance of an ITP and would be better spent correcting the issues that FWS repeatedly identified with the HCP.

## II.     FWS Reasonably Determined that the HCP Was Incomplete.

FWS reasonably found that Plaintiff's "final" HCP did not meet the ESA's requirements. Plaintiff refused to sufficiently break down the different components of its proposed activities and thus could not properly calculate the take likely to happen. Plaintiff also would not account for likely causes of species take discussed in the scientific literature. While Plaintiff claims that its descriptions of the project activities and take are sufficient, the text of the HCP shows otherwise.

FWS reasonably found that Plaintiff did not submit a complete description of the effects from the proposed project's activities. *See* 50 C.F.R. §§ 17.22(b)(1)(i), 17.32(b)(1)(iii). While FWS repeatedly notified Plaintiff about this issue, *see, e.g.*, AR-5219, 5179–80, 5128, 4345, 4303,

4150–52, 3771, 3755, 3645–47, 2283, 1787, 1471–537; SAR-1022, the HCP itself acknowledges that it does not include a description of all the project activities, noting that the activities for haul roads "include, but are not limited to" the description provided in the document. AR-115. And other deficiencies in the HCP are readily apparent when compared with analyses provided by FWS in its February and April 2021 memoranda that it prepared to assist Plaintiff with the HCP. For example, the HCP discusses that log landings are generally 0.25 and 0.5 acres of cleared and graded land to allow for loading the timber onto trucks, emphasizing that Plaintiff intends to "reclaim" the log landings by seeding and mulching the soil. AR-115–16, 165. But as FWS explained, creating log landings will create large, persistent gaps in the forest canopy, and will also have long-term impacts to forest floor conditions because the ground disturbance and soil compaction caused by heavy equipment could further isolate fragmented CM salamander populations. AR-1384; AR-1023–24. These are well-documented effects from construction activities, and FWS has addressed CM salamander habitat fragmentation caused by construction in biological opinions for other projects. *See, e.g.*, Biological Opinion for Columbia WB Xpress Project at 24 (June 20, 2017) https://ecos.fws.gov/tails/pub/document/7502585 (last visited Aug. 16, 2023). Environmental groups also noted that Plaintiff had not addressed this issue in a previous draft. AR-3824. Nowhere does the HCP grapple with these long-term effects from log landings, despite FWS's repeated requests that it do so.[10] FWS also discussed that edge effects—which reduce leaf litter depth, dry mass, and moisture content near large canopy gaps and hardened surfaces like gravel roads—would likely generate long-term impacts to CM salamander. AR-1384.

---

[10] Plaintiff contends that the HCP's discussion of the short-term impacts from surface grading and skidding sufficiently addresses the effects of soil compaction. ECF No. 42 at 18. But the HCP does not account for long-term habitat fragmentation caused by compaction from the different logging activities or the potential for take due to habitat fragmentation caused by compaction.

Again, FWS has addressed this effect in other BiOps and would need to do so here. AR-1579, 1584. But the HCP fails to fully address edge effects, including in the context of log landings and skid trails. *See* AR-159.

Plaintiff's claim that FWS asks Plaintiff to include the impossible in the HCP has no merit. FWS went far beyond what it normally does for ITP applicants, but Plaintiff declined using the agency's assistance. FWS wrote detailed sample analyses for the HCP that Plaintiff could have incorporated but elected not to. *See* AR-3653, 1471–537. FWS also provided Plaintiff with examples from other projects and came up with proposed solutions for the issues it found with the HCP. AR-5212–18, 4146, 3746, 1450–51, 4304–13; SAR-1017. Contrary to Plaintiff's hyperbole, FWS did not ask Plaintiff to identify exact coordinates of prospective skid trails and log landings. *See* ECF No. 42 at 17. Instead, FWS asked Plaintiff to elaborate on how often Plaintiff expected to re-use skid trails and log landings rather than construct new ones. *See* AR-63. That is because, as FWS explained, while re-using the sites would still likely have impacts, those impacts would be less than those caused by disturbing new sites. AR-1024. So, for FWS to accurately assess the project's effects, Plaintiff needed to provide more details about its plans.

FWS also reasonably found that Plaintiff did not completely account for potential take. Plaintiff limited the take analysis for CM salamander only to areas where suitable habitat for the species was mapped in 2008 even though the property had not been systematically surveyed for CM salamander habitat at that time or since. AR-1028, 125–27; *see* AR-SciLit-2866, 2760. Far from insisting on the impossible, FWS recommended that Plaintiff incorporate measures into the HCP, already developed by the Forest Service, that would prevent take if Plaintiff encountered CM salamander or its habitat in areas that the HCP did not address. AR-1029. Plaintiff refused to do so. Plaintiff also would not acknowledge the possibility that CM salamander could be active

between mid-October and the end of March depending on environmental conditions and refused to account for potential take caused by logging activities during that timeframe. AR-64. FWS pointed Plaintiff to four studies supporting the agency's understanding that the dates of CM salamander dormancy and emergence vary from year to year based on temperature and moisture fluctuations, and that warming temperature trends could lead to CM salamander going dormant later in the year or emerging earlier. AR-1376–77. Thus, FWS recommended that Plaintiff either include a measure in the HCP that would suspend timber activities if ambient conditions during the October-through-March timeframe supported CM salamander activity or account for that potential take. AR-1377. Plaintiff, again, refused.

These issues with the take calculations are not just "substantive critiques" by FWS as Plaintiff contends, *see* ECF No. 42 at 18–19, but fundamental flaws with the HCP. Because Plaintiff refused to include the level of detail in its take analyses that FWS advised, the HCP incompletely accounted for take. And because take was underrepresented, FWS could not determine whether the mitigation measures proposed by the HCP sufficiently address the likely take. And if the sufficiency of the proposed mitigation measures is uncertain, then Plaintiff cannot ensure that it can fund whatever mitigation might be necessary. Thus, the flawed take calculations mean that none of the requirements of ESA Section 10(a)(2)(A) can be met. *See* AR-65.

In sum, FWS rationally found that the HCP was incomplete. The agency repeatedly informed Plaintiff what its conclusions were, why it reached them, and how Plaintiff could fix them. But FWS's explanations fell on deaf ears. Rather than incorporating the analyses that FWS provided, Plaintiff now comes to this Court to try to force a statutorily incomplete HCP through the rest of the ITP application process. The Court should not be swayed by Plaintiff's renegade tactics and should grant summary judgment in FWS's favor.

### III.    The Record Does Not Support a Showing of Bad Faith.

In a last-ditch effort to salvage its deficient HCP, Plaintiff argues—without any record support—that the agency acted in bad faith. But the record refutes Plaintiff's claim, showing that FWS went out of its way to assist Plaintiff with the HCP and worked to allow logging operations to go forward when feasible. *See* AR-8436, 8472–75, 8859-61, 9107–09, 9379–83; SAR-1023. Plaintiff points to no evidence in the record showing clear wrongdoing by FWS. Nor does Plaintiff show that any delay by FWS impacted Plaintiff's ability to fix the HCP's issues. At most, Plaintiff shows that it disagrees with FWS's interpretation of the facts, which does not constitute bad faith.

The burden that Plaintiff bears to demonstrate agency bad faith is a heavy one. *See Tafas v. Dudas*, 530 F. Supp. 2d 786, 797 (E.D. Va. 2008). Courts presume that government officials act "properly and in good faith." *Id.* (quoting *Mullins v. U.S. Dep't of Energy*, 50 F.3d 990, 993 (Fed. Cir. 1995)); *see FTC v. Baltimore Paint & Color Works*, 41 F.2d 474, 476 (4th Cir. 1930). To overcome the presumption of agency good faith, a party "must show specific facts to indicate that the challenged action was reached because of improper motives," like fraud or clear wrongdoing. *Outdoor Amusement Bus. Ass'n v. Dep't of Homeland Sec.*, No. CV ELH-16-1015, 2017 WL 3189446, at *19 (D. Md. July 27, 2017) (citation omitted); *see Mullins*, 50 F.3d at 993; *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 460–61 (4th Cir. 1993) (finding bad faith where agency employee filed fraudulent documents and "perjured himself repeatedly"). "[D]isagreement with an agency's ultimate decision, or with its interpretation of the factual materials before it does not constitute bad faith." *Outdoor Amusement*, 2017 WL 3189446, at *20 (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1044 (2d Cir. 1983)).

Plaintiff points to nothing that supports the notion that FWS had improper motives for its determination that the HCP was incomplete. To the contrary, as discussed above, the record shows that FWS had good reasons for its finding. *See* AR-59–65; *supra* Section II. Plaintiff points to

several representations by FWS that it characterizes as "unreasoned" and "contradictory." ECF No. 42 at 21–23. But even assuming that Plaintiff's characterizations are true—which they are not[11]—Plaintiff does not cite a single case showing that alleged "unreasoned" or "contradictory" statements by an agency rise to the level of bad faith, and none of the statements Plaintiff cites show that the agency engaged in improper actions like fraud or perjury. *See Shaffer*, 11 F.3d at 460–61. If anything, Plaintiff's arguments show that it merely disagrees with FWS's conclusions, which does not support a finding of bad faith. *Outdoor Amusement*, 2017 WL 3189446, at *20.

Plaintiff also does not demonstrate that whatever delay present in this case rises to the level of bad faith.[12] Again, Plaintiff does not cite anything in the record suggesting that FWS delayed its work on the HCP for some nefarious purpose. Nor could it. While FWS acknowledged that there were periods of time where it could not review Plaintiff's HCP, the agency explained that it had limited resources, and given the many outstanding issues and significant deficiencies that plagued the HCP as well as Plaintiff's reluctance to address them, it had to focus those resources on the other demands of its full docket. AR-4344–46, 3801–06. But FWS always showed a willingness to work with Plaintiff, going so far as to draft analyses for the HCP, involve the Regional Office earlier than usual in the process, and assign additional staff from the New York

---

[11] Plaintiff characterizes what could be very real sources of take for the CM salamander if residential development went forward as "facially ridiculous," illustrating the dismissive mindset that Plaintiff has taken towards the entire ITP process. *See* ECF No. 42 at 21. Plaintiff also mischaracterizes FWS's suggestion to shorten the ITP's duration in light of climate change, which FWS first raised in 2016 and did so with the hopes that it would make the HCP less complex and thus easier to complete more quickly. *See* AR-3918; SAR-749. Also contrary to Plaintiff's contention, FWS provided citations when recommending changes to the HCP's effects matrices. *See, e.g.*, AR-1384, 1397–408, 1372–73. And FWS's reasoning regarding the use of temperature and moisture for CM salamander take estimates is discussed above. *Supra* Section II at 20–21.

[12] The hypothetical timeline in the HCP Handbook that Plaintiff cites to is, as its name suggests, hypothetical. *See* ECF No. 42 at 23. The HCP Handbook clarifies that timeframes may be shorter or longer based on various factors, including the commitment of resources to the process by the applicant and the availability of necessary information to help FWS make an informed decision. HCP Handbook at 2-10.

Field Office to assist Plaintiff with the document. AR-7199–201. FWS's actions show an agency carrying out its many statutory duties while facing limited resources and an unwilling applicant.

None of the cases cited by Plaintiff support its position. Almost all the decisions are at the administrative record stage of litigation and address whether to allow extra-record discovery, not decisions on the merits of an APA claim.[13] *Sokaogon Chippewa Cmty. v. Babbitt*, 961 F. Supp. 1276, 1285 (W.D. Wis. 1997) (discussing that a decision to allow extra-record discovery "is a very different burden from the ultimate burden plaintiffs have" to prove bad faith); *see In re U.S. Dep't of Educ.*, 25 F.4th 692, 702 (9th Cir. 2022); *Tummino v. Von Eschenbach*, 427 F. Supp. 2d 212, 231 (E.D.N.Y. 2006). And the plaintiffs in those cases made the strong preliminary showing of bad faith necessary to allow for discovery regarding whether the agency delayed making a decision for an improper purpose. *In re U.S. Dep't of Educ.*, 25 F.4th at 703 (upholding finding that deposition was appropriate where the agency represented that it delayed application decisions for 18 months because of the "time-intensive process," but then denied them with form letters); *Tummino*, 427 F. Supp. 2d at 232–33 (ordering extra-record discovery where agency had not issued decision authorizing drug for five years despite overwhelming support of the agency's staff); *Sokaogon Chippewa Cmty.*, 961 F. Supp. at 1286 (ordering extra-record discovery where "there is considerable evidence that suggests that improper political pressure may have influenced agency decisionmaking"). Here, the reasons for FWS's finding are extensive and well-documented, supported by agency staff, and with no indication of improper purpose.

The only case decided on the merits that Plaintiff cites is also not on point. In that case, the agency provided no explanation for the delay, *Sun Il Yoo v. INS*, 534 F.2d 1325, 1328 (9th Cir.

---

[13] Plaintiff chose not to file a record motion by the appropriate deadline and has waived its ability to do so. *See* ECF Nos. 36, 38.

1976), unlike here, *see* AR-4344–46, 3801–06. The *Yoo* court also found that the agency's delay foreclosed the applicant's ability to apply for an immigration status even though he had been eligible when he initially submitted his application. *Yoo*, 534 F.2d at 1329. But here, Plaintiff has not lost the ability to apply for an ITP—to the contrary, Plaintiff may renew its application at any time, as long as it addresses the deficiencies in the HCP identified by FWS.

For all these reasons, Plaintiff fails to meet its heavy burden of proving bad faith, and the Court should not be swayed by Plaintiff's unsubstantiated pronouncements.

## IV.   No Remedy Is Warranted, but Should the Court Be Inclined to Grant Any Relief, It Should Be Limited to Vacatur of the Agency Decision.

Plaintiff asks the Court to set aside FWS's decision, declare that its ITP application is statutorily complete, compel FWS to provide public notice of the application in the Federal Register, and retain jurisdiction over this case until FWS issues a decision on the ITP application. ECF No. 42 at 25. Plaintiff has no right to any relief because FWS's action was reasonable and consistent with governing law. But even if the Court were to find a legal violation, "the ordinary remedy upon a finding that final agency action violates the APA is vacatur of the decision and remand to the agency." *Harrison v. Kendall*, -- F. Supp. 3d --, No. 1:22-cv-1298 (LMB/JFA), 2023 WL 3016277, at *10 (E.D. Va. Apr. 20, 2023). This is because "[o]rdering a specific remedy or outcome on remand . . . is inconsistent with the Court's role in reviewing final agency action under the APA, in which it 'sits as an appellate tribunal.'" *Id.* (quoting *Palisades Gen. Hosp. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005)). Thus, if the Court is inclined to grant any relief, it should be limited to vacatur and remand of the finding that the HCP was incomplete.

### CONCLUSION

For all these reasons, Defendants' Cross-Motion for Summary Judgment should be granted, and Plaintiff's Motion for Summary Judgment should be denied.

Dated: August 18, 2023                    Respectfully submitted,

                                          WILLIAM J. IHLENFELD, II
                                          United States Attorney

                                          */s/ Maximillian F. Nogay*
                                          MAXIMILLIAN F. NOGAY
                                          Assistant United States Attorney
                                          (WV Bar No. 13445)
                                          United States Attorney's Office
                                          1125 Chapline Street, Suite 3000
                                          P.O. Box 591
                                          Wheeling, WV 26003
                                          Tel: (304) 234-0100
                                          E-mail: max.nogay@usdoj.gov

                                          ERIN K. REISENWEBER
                                          Assistant United States Attorney
                                          (WV Bar No. 9537)
                                          United States Attorney's Office
                                          217 West King Street, Suite 400
                                          Martinsburg, WV 25401
                                          Tel: (304) 262-0590
                                          E-mail: erin.reisenweber@usdoj.gov

                                          TODD KIM
                                          Assistant Attorney General
                                          S. JAY GOVINDAN
                                          Section Chief
                                          BRIDGET KENNEDY McNEIL
                                          Assistant Section Chief

                                          */s/ Kamela A. Caschette*
                                          Kamela A. Caschette
                                          Trial Attorney
                                          United States Department of Justice
                                          Environment & Natural Resources Division
                                          Wildlife & Marine Resources Section
                                          Ben Franklin Station
                                          P.O. Box 7611
                                          Washington, DC 20044-7611
                                          Tel: (202) 305-0340
                                          E-mail: kamela.caschette@usdoj.gov

                                          *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2023, I electronically filed the foregoing Memorandum in Support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Maximillian F. Nogay*
MAXIMILLIAN F. NOGAY
Assistant United States Attorney
(WV Bar No. 13445)
United States Attorney's Office
1125 Chapline Street, Suite 3000
P.O. Box 591
Wheeling, WV 26003
Tel: (304) 234-0100
E-mail: max.nogay@usdoj.gov

*Attorney for Defendants*