IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION

ALLEGHENY WOOD PRODUCTS, INC.,

    **Plaintiff,**

v.                                           Civil Action No. 22-cv-00007

UNITED STATES FISH AND WILDLIFE
SERVICE, et al.,

    **Defendants.**

### PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Allegheny Wood Products ("AWP") simply wants to *apply* for an incidental take permit from the U.S. Fish and Wildlife Service ("FWS"). Like any government application, FWS can rightfully tell AWP that it left a line completely blank or forgot to check a box. But what the agency cannot do is refuse to accept a complete permit application — for sixteen years in this case — because it thinks it will probably deny the permit anyway. Yet that is exactly what FWS has done here. Despite agreeing with AWP that application and issuance are separate stages in the permitting process with different sets of statutory criteria, FWS's response repeats its error of a never-ending demand for more detail and criticism based on final issuance criteria. In the end, this case is about AWP merely wanting to apply for a permit and receive a final decision, up or down, that is subject to judicial review. Because AWP's application includes all the information requested by in the application criteria, the Court should

set aside FWS's rejection of the application and declare the application statutorily complete.

## BACKGROUND

In its opening brief, AWP describes how FWS abused its bureaucratic machinery to delay AWP's application for more than sixteen years. In its response, the agency asserts that, in fact, it was AWP that tried furtively to game the system for nearly two decades rather than go through the approximately two-year process of obtaining an incidental take permit. Not only is that narrative implausible on its face—why would a private company thwart its own business activity for nearly two decades rather than engage in fairly routine regulatory compliance—but FWS's story is also wholly at odds with the administrative record. A few examples of FWS's mischaracterization of the record are discussed below.

First, FWS purports that, right out of the gate, AWP skirted its ESA regulatory obligations in the face of FWS's warnings by conducting limited logging activities on its property from 1997 through 2000. ECF No. 45-1, at 6. But the administrative record demonstrates that AWP worked closely with the agency during this period to ensure that its activities would not result in any "take" of listed species, thereby obviating the need to seek an incidental take permit in the first place.[1] Indeed, FWS affirmed to AWP—over and over again—that its logging activities were unlikely to result in a "take" of listed species. *See* AR9400, AR9387-90, AR9287-88, AR9099-100,

---

[1] The incidental take permit process is voluntary. Its purpose is to act as a safe harbor in the event covered activity results in a take of a listed species. *See Save Our Springs Alliance v. Norton*, 2007 WL 958173, at *4 (W.D. Tex. Feb. 20, 2007).

AR8940-42, AR8859-60, AR8851-53, AR8472-74, AR8429-32, AR8411. Similarly, FWS claims that AWP again skirted its regulatory obligations during limited timbering activities in 2008 to 2009. ECF No. 45-1, at 6-7. But the administrative record shows that AWP had communicated with FWS and believed that its timbering was "no take" based on the logic of the agency's previous decisions. AR5101-04. This critical context is noticeably absent from FWS's brief.

Next, FWS takes issue with AWP's March 2013 draft habitat conservation plan ("HCP"), decrying it as only twelve pages and significantly deficient. ECF 45-1, at 7. FWS fails to mention that the draft HCP was, *at FWS's behest*, an "Adaptive Management HCP rather than a typical HCP." AR4401; *see also* AR4342.[2] Perhaps the most significant hurdle of this permitting process is the lack of specific study of the impact of modern timbering activity on the Cheat Mountain Salamander. That lack of study requires the use of studies on other salamander species as an analog, albeit a very accurate one. The Adaptive Management HCP proposed in early 2013 would have completely solved that problem: it proposed a five- to seven-year study, in conjunction with FWS, on the impact of modern timbering techniques on Cheat Mountain Salamander population on a limited piece of AWP's property. *Id*. The Adaptive Management HCP further provided that AWP would develop a full-scale HCP based on the results of the study. *Id*. The agency failed to respond to the proposal

---

[2] "In its simplest form adaptive management is learning by doing . . . ." HCP Handbook at 10-28; *see also id.* at 10-28 through 10-29.

3

that it solicited for *nearly three years*. AR4302-05; *see also* 4150-52.[3] And when FWS finally did meet with AWP to discuss the proposed study, it inexplicably reversed course. AR4150-52. Had the agency accepted its own proposal, this entire matter could have been conclusively resolved five years ago. Again, FWS fails to provide the full picture.

On its own, FWS's conduct throughout its dealings with AWP shows that the agency failed to engage in the "reasoned decisionmaking" required by the APA. *Michigan v. E.P.A.*, 576 U.S. 743, 750 (2015). But even if AWP does not prevail based on FWS's conduct alone, this Court need only decide a single issue: whether FWS rejected AWP's application based on the wrong set of statutorily-defined criteria.

## DISCUSSION

The parties appear to agree on at least two threshold items: (1) that the application intake stage and the substantive review stage are two distinct steps in the review process; and (2) that each step is governed by a different set of criteria. ECF No. 45-1, at 2-5. Though each step and related set of criteria are clearly spelled out in statute and mirrored by regulation, FWS argues that it is entitled to nearly unlimited agency deference when determining if the application criteria have been satisfied and thus whether an application advances to substantive review. But not only does the statute not afford FWS *any* degree of deferential authority at the application intake stage, the level of deference afforded FWS is ultimately beside the

---

[3] The administrative record shows that FWS simply ignored AWP, admitting that "It really looks bad that we keep putting them off." AR4376.

point. No amount of deference permits FWS to misapply the substantive review criteria at the application intake stage, as it has done in this case. *See Bennett v. Spear*, 520 U.S. 154, 172 (1997) ("It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decision making."). FWS's textual analysis in search of deference wholly fails to remedy that fundamental problem: whether the agency applied the wrong set of criteria in rejecting AWP's application.

I.  **At the intake stage, FWS lacks deference to substantively review a permit application for completeness.**

None of the three isolated statutory and regulatory provisions cited by FWS give the agency discretionary authority to substantively review an incidental take permit application at the intake stage. *See* ECF No. 45-1, at 13-14. The first is a residual clause, *see Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001); the second is merely a category of information an applicant must provide; and the third provides only that an application should be complete. Tellingly, the only time FWS is allowed to "find," "decide," or "consider" anything is during the final issuance stage. 16 U.S.C. § 1539(a)(2)(B); *see also* 50 C.F.R. § 17.22(b)(2)(i). Nor does FWS's lone case citation support its position. On the contrary, in *Leander Independent School District v. U.S. Department of the Interior*, the magistrate judge endorsed AWP's position here: "whether to complete the Application is entirely within the [applicant's] control." No. 1:22-cv-310, 2022 WL 19300727, at *4 (W.D. Tex. Dec. 21, 2022). FWS's approach to the application stage in this case is completely novel, rebuffed by the case law, and contrary to the plain statutory text.

5

## II.     FWS applied the wrong criteria in rejecting AWP's application.

The *application* criteria are spelled out in 16 U.S.C. § 1539(a)(2)(A) and 50 C.F.R. § 17.22(b)(1). The *issuance* criteria are spelled out in 16 U.S.C. § 1539(a)(2)(B) and 50 C.F.R. § 17.22(b)(2). The statutory text makes clear that one comes after the other: Section 1539(a)(2)(B) directs FWS to make findings on an HCP "after opportunity for public comment" on the HCP. Thus, the criteria for each stage of review, the sequence of review, and FWS's role at each stage derive straight from the plain text of the statute. FWS nevertheless persists in confusing the two sets of criteria and its respective roles.

For instance, FWS claims that several problems flow from AWP's alleged "refus[al] to include the level of detail in its take analyses that FWS advised," and that those problems sink AWP's application under the application criteria of Section 1539(a)(2)(A). ECF No. 45-1, at 21. But FWS is clearly wrong. Each supposed problem appeals to the issuance criteria of Section 1539(a)(2)(B). FWS worries "whether the mitigation measures proposed by the HCP sufficiently address the likely take" because the HCP allegedly "incompletely accounted for take." *Id.* But that concern over the extent and severity of take is a substantive critique falling under Section 1539(a)(2)(B)(ii) and (iv)'s requirements that an applicant properly minimize take, such that the take will not "appreciably reduce the likelihood of the survival and recovery of the species in the wild." Along the same lines, the agency argues that if the extent and severity of take is insufficiently detailed, "then [AWP] cannot ensure that it can fund whatever mitigation might be necessary." ECF No. 45-1, at 21. But

6

adequacy of funding expressly appears under Section 1539(a)(2)(B)(iii): "the applicant will ensure that adequate funding for the plan will be provided." Contrary to what FWS claims, those critiques of AWP's HCP draw from the issuance criteria even though AWP's application is only at the intake stage.

Similarly, though AWP already agreed to limit all activities to the months between November 15 and March 15 when the salamander is typically dormant, FWS's brief complains that AWP refused an additional limitation proposed by the agency: suspend all operations on all intermittently warmer winter days. Here, again, FWS is opining on the suitability of AWP's proposed mitigation plan rather than ensuring the completeness of its application. If FWS believes that AWP's mitigation plan is inadequate, then it may—at the appropriate juncture—make an adverse finding as to that specific issuance criteria. *See* 16 U.S.C. § 1539(a)(2)(B)(ii) (requiring a finding that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking").

That FWS applied the wrong criteria at the intake stage is also manifest throughout its rejection letter. For instance, the agency repeatedly complains that "the Draft HCP does not incorporate the best available science." AR62-63. This complaint is illustrative of four points. *First*, FWS is plainly challenging AWP's scientific conclusions, rather than quarreling with the level of detail provided. *Second*, the "best available science" standard derives from an entirely different code section, Section 1536 ("Section 7"). *Third*, Section 7, which imposes the obligation to prepare a biological opinion, is not triggered until *after* an application is advanced

7

past the intake stage. *See* 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.14(h). *And fourth*, FWS (not AWP) is tasked with preparing a biological opinion based on the "best scientific and commercial data available." *See id.* So, not only did FWS apply inappropriate criteria, but it also saddled AWP with burdens reserved to the agency itself. Anyone of these reasons is grounds for vacating the agency's decision.

Because it improperly rejected AWP's application using the substantive *issuance* criteria, rather than simply ensuring that the application satisfied the formulistic *application* criteria, FWS now attempts to recharacterize its criticisms to more-neatly fit under one of the appropriate criterium.[4]

For instance, in seeming recognition that AWP did indeed describe the *short-term* impacts from construction and use of log landings and skid trails, FWS now complains that AWP failed to discuss the *long-term* impacts of those same features. ECF No. 45-1, at n.10. The agency frames this as a plea for additional information. But this criticism has nothing to do with the sufficiency with which AWP described likely impacts. Rather, this reduces to a scientific disagreement as to whether those particular activities cause long-term impacts in the first place.[5] If FWS disagrees with

---

[4] FWS points to the residual criterium of Section 1539, which requires an applicant to specify "such other measures" that FWS may require, as a source of discretionary authority. FWS does not, however, suggest that it imposed any such measures or that AWP failed to satisfy that criterium. This criterium is therefore not at issue.

[5] As evidenced by FWS's February and April 2021 memoranda, the parties were debating whether skid trails and log landings even present barriers to the salamander's movement or hinder genetic mixing. *See*, *e.g.*, AR268-271. At no point in either memorandum does FWS suggest that AWP's impact descriptions were lacking in detail. *See* AR262-281, AR1021-1030.

AWP's scientific conclusions, then it is free to disassemble those conclusions at a later stage when weighing the issuance criteria. The application criteria do not, however, give the agency license to reject an application based on differences of scientific opinion.

The approach FWS takes to application intake review in this case is completely novel. *Compare Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1291 (E.D. Cal. 2000) (FWS arguing that an HCP requires only general descriptions). By rejecting AWP's application at the intake stage, the agency has been able to hide behind generalized objections and a bottomless definition of completeness, which is incapable of objective measurement. Had it advanced the application past the intake stage—at which point FWS shall weigh the merits of AWP's proposed take and mitigation—FWS would then be on a mandatory timeline to show its work in a biological opinion using the "best scientific and commercial data available." 50 C.F.R. § 402.14(h); *see also Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 596 (D.C. Cir. 2023) (providing that, in preparing a biological opinion, FWS must "make a prediction about effects and, if the agency cannot reject the null hypothesis (no jeopardy) as unlikely, then grant a license"). By collapsing the review process and refusing AWP's application at the forefront, the agency has impermissibly placed the onus of scientific explanation on AWP and functionally dodged making a final, substantive decision that is subject to judicial scrutiny.

## III. AWP submitted a complete application when measured against the appropriate criteria.

A complete application requires, among other things, a "complete description of the activity sought to be authorized." 50 C.F.R. § 17.22(b)(1)(i). FWS argues that AWP failed to sufficiently deconstruct the activities incidental to constructing haul roads. ECF No. 45-1, at 19-20. Yet, in bemoaning the sufficiency of those descriptions, the agency sidesteps the most obvious question: what *exactly* does it believe is missing? And taking that one step further: how would this missing information preclude FWS from passing judgment on the issuance criteria at the next stage? After all, as the agency acknowledges, AWP's project descriptions need only be so granular as to allow FWS to form a judgment as to the likelihood of jeopardizing a covered species.[6] That FWS avoids answering these obvious questions says it all.

Rather than provide specifics, FWS argues that AWP's project descriptions are generally incomplete, as evidenced by the use of "including but are not limited to" when describing the activities incidental to constructing haul roads. ECF No. 45-1, at 20. This argument is emblematic of the petty criticisms that have long plagued the agency's review. Road construction is not a novel land use. Nor are the tasks incidental to road construction a mystery. But, in the event these things weren't plainly obvious, AWP described the proposed construction and use of haul roads as follows:

---

[6] ECF No. 45-1, at 16 ("FWS explained that the HCP must provide enough information about an applicant's proposed activities to enable FWS to understand and adequately analyze the anticipated take, and concluded that AWP did not do so.") (cleaned up).

10

> Haul Roads: AWP's private haul roads, designed to be accessible by large trucks, form the spine of the infrastructure network needed to support commercial timber operations. Haul roads are not open to the public. A typical haul road is approximately 20 feet wide within a cleared right-of-way that may be up to 120 feet wide. The width of this corridor allows the road surface to be dried by sunlight and air circulation, thereby preventing the need for pavement to maintain adequate driving conditions for large trucks. Haul roads may also serve as fire breaks and provide access for emergency vehicles, if needed. AWP intends for haul roads on the Subject Property to be permanent features for the Permit Duration.
>
> Activities needed to construct, maintain, or repair haul roads include, but are not limited to, vegetation management within rights-of-way (i.e., removing trees, mowing brush and grass, seeding disturbed soils with seed mixes approved by the Forest Stewardship Council for wildlife values, and mulching with weed-free straw), grading or blading of the road surface to establish proper drainage, applying gravel to the road surface, and installing or cleaning debris from culverts. Once constructed, AWP conducts maintenance on haul roads in approximately 5-year intervals.
>
> The Subject Property contains approximately 7.5 miles of Existing Haul Roads associated with approximately 114.2 acres of right-of-way. Some of this right-of-way area is associated with existing public roads. AWP anticipates the need to construct an additional 1.1 miles of haul road within the Subject Property that would be associated with 14.8 acres of New Haul Road right-of-way. Figure 3 shows the approximate locations of Existing and proposed New Haul Roads within the Subject Property.

AR115.

AWP's description is either greater to or on level with other HCPs recently approved by FWS. Take, for example, the July 2019 LCRA TSC Transmission System HCP, which likewise dealt with the construction of access roads and resulting edge effects for amphibians. That HCP, which the agency approved, described road construction as follows:

> **Access Road Construction or Improvement**—New Construction often requires the pre-construction installation of new access roads or improvement of existing access roads to or within Facilities. LCRA TSC has a preference, to the extent practicable, for improving existing access roads over the construction of new roads. Access road activities may involve hand or mechanical vegetation clearing, surface grading, cut/fill, placement of at-grade or above-grade road base or similar material, installation of culverts or fill at water crossings, and reinforcement of construction site entrances from public roadways. LCRA TSC constructs or improves access roads to the minimum width necessary to provide access (typically 20 feet wide, with wider segments at turns and at construction site entrances). Access road activities involve pedestrian traffic and the use of passenger vehicles, bulldozers, track loaders, hydro-axes, tractors with rotary or flail mowers, back hoes, chipper trucks, lift trucks, dump trucks, and similar machinery. Access road construction typically proceeds at 0.25 to 0.5 mile per day. Construction of a water crossing typically requires 3 hours to 1 day. Crews typically complete one to three construction site entrances per day.[7]

---

[7] See LCRA TSC Transmission System HCP, at 45, available at https://ecos.fws.gov/docs/plan_documents/thcp/thcp_3358.pdf (last visited Sept. 7, 2023)

Then there is the May 2020 Upper Santa Ana River Wash HCP, which likewise dealt with the construction of new access roads and resulting edge effects for amphibians. That HCP, which FWS also approved, described road construction as follows:

> **Construction of New Access Roads (CD.07)**
>
> The Conservation District will construct a limited number of new access or service maintenance roads to access new spreading basin facilities to be constructed in the Plan Area. As with the existing access roads, the Conservation District will give consent to several agencies to use them for their public service activities. Access roads will be 12–15 feet wide and surfaced with native material such as gravel or compacted soil. These roads will be maintained as described above for existing access roads. Construction of new access roads may permanently impact up to 12.0 acres and 3.7 acres temporary impacts for operations and maintenance.

[8]

There's more. FWS provides an online "Habitat Conservation Plan Handbook Toolbox," which points to the May 2014 Oil and Gas Industry HCP as an exemplar for future applicants. That HCP provides the following description:

> Construction of access roads may be necessary to reach pipelines and/or associated facilities if existing roads are not available. Some of these access roads may be reclaimed following construction; however others remain for operation and maintenance of the pipeline and associated facilities. Roads typically range in widths from 15-30 feet (4.6 – 9.1 meters), with an average length of 0.25 miles (0.40 kilometers), depending on the location and necessary use. Roads are expected to require periodic maintenance to correct washouts or other deterioration. Where necessary, culverts and ditches may be installed to facilitate drainage away from the road.

[9]

So, not only has the agency failed to identify any specific deficiencies in AWP's descriptions, and not only has it failed to explain how those deficiencies would

---

[8] *See* Upper Santa Ana River Wash HCP, p. 62, available at https://ecos.fws.gov/docs/plan_documents/thcp/thcp_3107.pdf (last visited Sept. 7, 2023)

[9] *See* Example Industry Conservation Plan: Final Habitat Conservation Plan, at p. 17, Available at https://www.fws.gov/media/example-industry-conservation-plan-final-habitat-conservation-plan (last visited Sept. 5, 2023).

hamper its ability to later assess the issuance criteria, but AWP's description for the same activity is greater than or on level with other HCPs approved by FWS. FWS states that it "went far beyond what it normally does for ITP applicants." ECF No. 45-1, at 21. AWP agrees, but probably not in the way that the agency intends.

The reasoning of FWS's brief actually undermines the criticisms identified in its rejection letter. For example, in the rejection letter, FWS complains that AWP has failed to sufficiently describe the activities incidental to constructing log landings and skid trails. AR62-63. Without these details, the agency argues, it cannot possibly discern the types of resulting impacts. *Id*. But, in stressing the project's implications, FWS proceeds to identify and discuss the impacts of those same activities—e.g., reduced leaf litter, soil compaction, and canopy gaps—all of which FWS admits are "well-documented effects" that have been addressed in other biological opinions. The agency has thus unwittingly acknowledged the sufficiency of AWP's activity descriptions.

## IV. This Court can (and should) set aside FWS's rejection and deem AWP's application statutorily complete.

FWS suggests that plaintiffs are entitled only to narrow forms of relief under the APA. *See* ECF No. 45-1, at 25. But the APA is not so limited. A plaintiff bringing an APA claim "may seek and obtain *any relief* from the court other than monetary damages." *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 262 (4th Cir. 2022) (emphasis in original) (citing 5 U.S.C. § 702); *see also Friends of Wild Swan v. EPA*, 74 F. App'x 718, 721–22 (9th Cir. 2003) ("Equitable considerations are appropriate in reviewing agency decisions under the APA and crafting a remedy.").

13

For instance, the Fourth Circuit recently addressed a case where, just as FWS has done in this case, a federal agency "ignored the parameters of a statute and improperly expanded the scope of a provision beyond the plain limitations in its text." *Northrop Grumman Sys. Corp. v. DOL*, 927 F.3d 226, 235 (4th Cir. 2019) (cleaned up). Upon vacating the agency's decision, the Fourth Circuit found it appropriate to remand the case to the agency with specific instructions consistent with a proper reading of the statute. *Id.* at 235-36; *see also Friends of Wild Swan*, 74 F. App'x at 722 ("We have previously found remand with specific instructions to be an appropriate remedy for APA violations."). Like the Fourth Circuit in *Northrop Grumman*, this Court should enter an order vacating FWS's decision and remanding the case to the agency with instructions to certify AWP's application as statutory complete.

## CONCLUSION

The rejection of AWP's application by FWS, as set forth in the October 17, 2022 letter (AR59-65), was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law. As a result, this Court should (1) set aside that decision, (2) declare that AWP's application is statutorily complete pursuant to 16 U.S.C. § 1539(a)(2)(A), (3) compel FWS to provide public notice of AWP's application in the Federal Register pursuant to 16 U.S.C. § 1539(c), (4) retain jurisdiction of this case until final agency disposition of the pending application as a whole; and (5) award AWP its fees and expenses pursuant to 28 U.S.C. § 2412.

**ALLEGHENY WOOD PRODUCTS, INC.**

By Counsel:

<u>/s/ Andrew C. Robey</u>
Isaac R. Forman (WVSB #11668)
Andrew C. Robey (WVSB #12806)
Carl W. Shaffer (WVSB #13260)
HISSAM FORMAN DONOVAN RITCHIE PLLC
P.O. Box 3983
Charleston, WV 25339
t: 681-265-3802
f: 304-982-8056
iforman@hfdrlaw.com
arobey@hfdrlaw.com
cshaffer@hfdrlaw.com

## **CERTIFICATE OF SERVICE**

I certify that on September 22, 2023, I filed the foregoing via the CM/ECF system, and the foregoing document was served on all counsel of record through the CM/ECF system.

                                            /s/ Andrew C. Robey
                                            Andrew C. Robey (WVSB #12806)