# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# ELKINS

| | |
|---|---|
| ALLEGHENY WOOD PRODUCTS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) Civil Action No. 2:22-cv-07 (Kleeh) <br> UNITED STATES FISH AND WILDLIFE ) <br> SERVICE, et al., ) <br> ) <br> Defendants. ) <br> ) | |

## DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS'
## CROSS-MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

The U.S. Fish and Wildlife Service ("FWS") has repeatedly made clear to Plaintiff what it must do to submit a complete habitat conservation plan ("HCP") with its incidental take permit ("ITP") application. FWS provided Plaintiff with detailed technical assistance for years, giving Plaintiff feedback on numerous draft HCPs and even drafting portions of the HCP for Plaintiff. FWS's patient efforts culminated in a 22-page single-spaced document outlining the issues with Plaintiff's draft HCP and a 45-page document modeling how to approach the necessary analyses. *See* AR-1471–537. But Plaintiff again refused to incorporate the expert agency's comments and feedback. Instead, Plaintiff now attempts to shift the blame for its failed application to FWS and to undermine the entire ITP process—a process that countless other applicants have successfully completed—by incorrectly interpreting the Endangered Species Act ("ESA") and its regulations. The choice is Plaintiff's: it can fix the issues with the draft HCP and resubmit its ITP application, or it can continue to impede its project by ignoring FWS's expertise and the ESA's requirements.

The Court should grant Defendants' Cross-Motion for Summary Judgment (ECF No. 45) and deny Plaintiff's Motion for Summary Judgment (ECF No. 41).

**ARGUMENT**

**I.   Plaintiff Fails to Show that FWS Lacks Discretion Over the ITP Application Process.**

FWS has discretion to decide whether an HCP and ITP application are complete, and Plaintiff has not shown otherwise. FWS explained in its opening brief how the text of Section 10 of the ESA and its implementing regulations gives FWS discretion to determine whether a draft HCP and ITP application are complete. ECF No. 45-1 at 14–15.[1] FWS also explained how Section 10 and its regulations operate as a whole and why that scheme is necessary for FWS to effectively

---

[1] The docket citations in this brief refer to the page numbers added to filings by the ECF system.

carry out its administration of the statute and issue ITPs. *Id.* at 15–19. Plaintiff does not meaningfully address, let alone rebut, these explanations. Instead of grappling with the language of ESA Section 10(a)(2)(A) and its regulations, Plaintiff tries to shrug off these provisions. Plaintiff also warps the reasoning behind FWS's fulsome explanation of the mechanics of the ITP process and why having a complete HCP is essential to successfully carrying out that process. Plaintiff's unsupported arguments should not sway the Court.

### A.   ESA Section 10(a)(2)(A) and Its Regulations Provide FWS With Discretion.

The text and structure of ESA Section 10(a)(2)(A) and its regulations show that their only reasonable interpretation is that FWS has discretion to determine if an HCP is complete. FWS agrees with Plaintiff that Section 10(a)(2)(A)(i) specifies a category of information that an applicant must provide in an HCP, that Section 10(a)(2)(A)(iv) could be interpreted as a residual phrase, and that 50 C.F.R. Sections 17.22(b)(1)(i) and 17.32(b)(1)(iii) state that an ITP application should be complete. *See* ECF No. 46 at 9. But those descriptions miss the point. The ESA's statutory and regulatory requirements include terms that require discretion, such as the "impact which will *likely* result from such taking," whether a description of the activity that the applicant seeks to authorize is detailed enough to the point of being "complete," and if there are "other measures that [FWS] may require as being necessary or appropriate for purposes of the [HCP]." 16 U.S.C. § 1539(a)(2)(A)(i), (iv) (emphasis added); 50 C.F.R. §§ 17.22(b)(1)(i), 17.22(b)(1)(iii)(A), 17.32(b)(1)(iii)(A), 17.32(b)(1)(iii)(C)(1). Plaintiff concedes this point, admitting that the term "completeness" is "incapable of objective measurement." ECF No. 46 at 9.[2] Because the ESA and its regulations only allow a completed application to proceed to Phase 3

---

[2] Plaintiff's characterization of the ITP application as a "box-checking exercise" cannot be squared with its acknowledgement that the ESA includes discretionary requirements for an HCP. *See* ECF No. 46 at 1. Box-checking exercises cannot contain elements that must undergo subjective review.

2

of the ITP process, someone must determine whether an applicant has met all the statutory and regulatory requirements for an ITP application, including those that are subject to discretion.

The question before the Court is which party determines if an applicant has completed the requirements of an ITP application: the applicant, or the agency receiving the application? Plaintiff points to nothing in Section 10 or its regulations showing that it has discretion to choose if its application is complete. While Plaintiff does make a meager attempt to show that the ESA and its regulations also do not give FWS that discretion, its arguments fail. *See* ECF No. 46 at 5. Section 10(a)(2)(A)(iv), and common sense, support that the agency receiving and reviewing the application—FWS—should decide whether it is complete, not the entity submitting it.

Section 10(a)(2)(A)(iv) demonstrates the discretionary authority that FWS has over an HCP's contents. It states that an ITP applicant must include "other measures that *[FWS] may require* as being necessary or appropriate for purposes of the plan." 16 U.S.C. § 1539(a)(2)(A)(iv) (emphasis added).[3] Plaintiff attempts to dismiss the plain meaning of Section 10(a)(2)(A)(iv) by claiming the statutory language is a "residual clause." ECF No. 46 at 5. But even if Section 10(a)(2)(A)(iv) is a residual phrase, that further supports FWS's discretionary authority. The case Plaintiff cites explains that courts can interpret a residual phrase using the statutory interpretation canon of *ejusdem generis*, meaning "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Cir. City Stores v. Adams*, 532 U.S. 105, 114–15 (2001) (quotation omitted). Applying *ejusdem generis* to Section 10(a)(2)(A)(iv) construes

---

[3] This provision proves wrong Plaintiff's claim that FWS may only make decisions during Phase 3 of the ITP process after an application has been deemed complete. *See* ECF No. 46 at 5. If FWS can require an applicant to include other measures as part of its HCP, then FWS must be able to decide what those other measures are.

3

the statute to mean that FWS can require an HCP to have other measures like the measures in Section 10(a)(2)(A)(i)–(iii).[4] It also means that the description of the "other measures" in Section 10(a)(2)(A)(iv) as those that FWS—not Plaintiff—requires as being necessary or appropriate for an HCP must also characterize the measures in Section 10(a)(2)(A)(i)–(iii). Thus, applying *ejusdem generis* to Section 10(a)(2)(A)(iv) as a residual phrase further solidifies FWS's discretion to dictate whether an HCP contains all necessary and appropriate measures.

Plaintiff takes a sentence from the opinion in *Leander Independent School District v. U.S. Department of the Interior*, No. 1:22-CV-310-RP, 2022 WL 19300727 (Dec. 21, 2022), *report and recommendation adopted*, 2023 WL 2706745 (W.D. Tex. Mar. 29, 2023), out of context to try and support its position. *See* ECF No. 46 at 5. But that case unquestionably supports FWS. The court found that FWS "controls the [ITP] application process," that FWS provided the applicant with "specific guidance—in writing, in person, and via teleconference—as to what a successful application must contain," and that the applicant "for whatever reason" declined FWS's entreaties to comply with that guidance. *Leander Indep. Sch. Dist.*, 2022 WL 19300727, at *3–5. Thus, the Court found that the ITP application was incomplete and that "whether to complete the Application is entirely within the [applicant's] control." *Id.* at *4. Similarly in this case, FWS repeatedly told Plaintiff what a successful application must contain, Plaintiff for whatever reason declined to follow FWS's guidance, and FWS unsurprisingly found that Plaintiff's ITP application was incomplete. Just like in *Leander*, it is entirely within Plaintiff's control to submit an ITP application that complies with the guidance that FWS has repeatedly laid out for it.

---

[4] Section 10(a)(2)(A)(i)–(iii) require an HCP to specify (1) the impact which will likely result from the incidental take caused by the applicant's project, (2) the steps the applicant will take to minimize and mitigate the impacts and the funding that will be available to implement those steps, and (3) the alternative actions to the taking that the applicant considered. 16 U.S.C. § 1539(a)(2)(A)(i)–(iii).

### B. ESA Section 10(a)(2)(B) Supports, Not Refutes, FWS's Discretion.

Rather than acknowledge the discretion that FWS has during Phase 2 of the ITP application process, Plaintiff incorrectly claims that FWS misapplied the Phase 3 ITP issuance criteria of Section 10(a)(2)(B) to determine that the HCP was incomplete. In doing so, Plaintiff ignores Section 10(a)(2)(A), which as discussed above allows FWS to use its discretion to find that Plaintiff did not describe all impacts that will likely result from the species take caused by the proposed project during Phase 2. To the extent that FWS referenced the Phase 3 issuance criteria in its opening brief, it did so to illustrate why the facts provided by Plaintiff in the HCP were insufficient.

Phase 2 of the ITP application process, during which the applicant drafts an HCP, is a fact-gathering phase. In the HCP, the applicant should break down its proposed action in a way that helps FWS fully understand the action so that it can fulsomely analyze the project in Phase 3. *See* Habitat Conservation Planning and Incidental Take Permit Processing Handbook at 2-8, 5-5 (December 21, 2016), https://www.fws.gov/sites/default/files/documents/habitat-conservation-planning-handbook-entire_0.pdf (hereinafter "HCP Handbook"). The applicant has on-the-ground knowledge of the project and will ultimately implement the proposal, and thus is in the best position to provide information about the project. During Phase 3, FWS uses the facts in the HCP to conduct the various environmental analyses that it must do before issuing an ITP. *See id.* at 5-2 ("The HCP needs to describe the effects and how they may or may not impact the covered species, because the Services must consider this information when analyzing effects in their section 7 biological opinions, National Environmental Policy Act (NEPA), and findings documents."). If the HCP does not provide enough factual detail, then FWS's analysis of the project will not pass muster.

5

Here, FWS did not need to wait until the next phase of review to find Plaintiff's application was inusfficient—it already knew the draft HCP was missing facts that Plaintiff could provide. For example, Plaintiff did not include a discussion about when, where, or how many new skid trails and log landings it would need to construct to carry out its project. AR-63. FWS also knew that soil compaction from heavy machinery could cause long term effects on Cheat Mountain Salamander ("CM Salamander"), and that Plaintiff failed to include those effects in the HCP even though FWS flagged that issue in previous drafts. *Id.*; AR-268–71.[5] So Plaintiff refused to include facts about the Project's impacts in its HCP that FWS knew it would need to analyze during Phase 3 of the ITP application process. And because the remaining facts that Plaintiff needed to provide in the HCP are tiered off the Projects' impacts,[6] FWS knew that Plaintiff did not include complete descriptions of those elements either. Thus, FWS found that the HCP was incomplete. AR-65.

Plaintiff claims that when making the decision that the HCP was incomplete, FWS—the expert wildlife agency—should have simply accepted Plaintiff's scientific conclusions about the effects of logging activities on species during Phase 2 of the ITP application process. ECF No. 46 at 8–9. This argument again ignores the discretion that FWS has over the contents of an HCP. Just because FWS has discretion to make determinations during Phase 3 does not mean it cannot have discretion over an HCP during Phase 2, especially because, as discussed above, the ESA and its regulations necessitate that FWS have discretion over the contents of an HCP. Here, applying the

---

[5] Plaintiff claims that FWS did not suggest that the HCP's impact descriptions lacked detail. ECF No. 46 at 8 n.5. But that is exactly what FWS said in those memoranda. *See, e.g.*, AR-268 ("AWP's proposal disregards potential impacts from skid trails and log landings by presuming that previous timber management salamander studies have accounted for felling and extracting material (such as creation and use of skid trails and log landings).").

[6] Those factors include the steps the applicant will take to minimize and mitigate the Project's impacts and the funding available to implement those steps. 16 U.S.C. § 1539(a)(2)(A)(ii).

best scientific and commercial data available, FWS used that discretion to evaluate whether the HCP sufficiently described the likely impacts of Plaintiff's project on species.

Plaintiff's arguments highlight the practical problems of its unsupported interpretation of Section 10.[7] Plaintiff argues that it should be able to choose what effects it includes in the HCP, even if FWS disagrees with its assessment, because FWS can later make a discretionary determination during Phase 3. *See* ECF No. 46 at 8–9. Under Plaintiff's scheme, FWS would be forced to put an HCP that it knows does not comport with the best available science through public notice and comment, and to conduct no less than four different analyses on a deficient document that it has no ability to change. *See* ECF No. 45-1 at 16–19. It is all but implausible that Congress would design a process resulting in a pointless public comment process, wasteful use of Federal Register resources, and a needless expenditure of scarce agency time and budget. The lone advantage to forcing an incomplete HCP into Phase 3, Plaintiff claims, is that FWS would either issue an ITP or a decision denying an ITP that includes its reasoning, which Plaintiff could then challenge. ECF No. 46 at 1, 9. But Plaintiff already has a mechanism to challenge FWS's reasoning, as this lawsuit demonstrates.[8] Thus, Plaintiff's concerns are unfounded, and the practicalities of the ITP process weigh against Plaintiff's incorrect interpretation of the ESA and its regulations.

While Plaintiff is correct that the Phase 3 ITP issuance process comes after the Phase 2 application process, ECF No. 46 at 6, that does not mean that the decisions to be made in Phase 3

---

[7] Plaintiff fails to address the numerous practical issues that would be caused by allowing an HCP that FWS knows is incomplete to proceed to Phase 3 of the ITP application process. *See* ECF No. 45-1 at 15–19.

[8] The administrative record contradicts Plaintiff's claim that FWS hides behind "generalized objections and a bottomless definition of completeness." ECF No. 46 at 9. FWS has time and time again told Plaintiff in detail what information it should include in the HCP, most recently via a 22-page single-spaced document outlining the issues with Plaintiff's draft HCP and a 45-page document modeling how to approach the necessary analyses. *See* AR-1471–537.

cannot inform the requirements of Phase 2. To the contrary, the impracticalities of divorcing the two phases illustrate why the Phase 3 analyses *should* inform FWS's evaluation of the contents of an HCP. *See Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 378 (4th Cir. 2022) ("[Courts] must interpret a statute 'as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into [a] harmonious whole.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))). Although Plaintiff claims FWS's interpretation of the ESA and its regulations is "novel," FWS has shown that it has discretion to decide if an HCP is complete, and that not having that discretion would make administering the ITP process overly burdensome for FWS, the applicant, and the public. The only thing novel about FWS's determination was the utter lack of cooperation that Plaintiff showed throughout the ITP application process.

## II. FWS Reasonably Determined that the HCP Was Incomplete.

Plaintiff's continued attempts to blame FWS for the incompleteness of its application all fail. Plaintiff's response does not renew its bad faith arguments. *See* ECF No. 42 at 21–23; ECF No. 45-1 at 23–26. Perhaps realizing that the administrative record supports FWS's determination that the HCP was incomplete, Plaintiff again tries to defend its conduct by mischaracterizing the record. Plaintiff also now grasps at improper extra-record evidence that, in any event, does not support its position. Plaintiff's inapposite arguments should not sway the Court.

### A. Plaintiff's Non-Cooperation Kept FWS from Finding the HCP Was Complete.

Plaintiff's refusal to appropriately engage in the ITP process has been its own undoing. Since 1997, FWS has tried to devise solutions that would allow Plaintiff to pursue its logging and residential development project and comply with the ESA. *See* ECF No. 45-1 at 6–11. Indeed, when Plaintiff did decide to meaningfully cooperate with FWS, it successfully carried out timber harvest operations. *See* AR-8851–54, 8436. But Plaintiff's unprecedented, combative approach towards incorporating—or, more accurately, not incorporating—FWS's technical feedback into

8

its HCP repeatedly prevented FWS from finding that Plaintiff's HCP was complete. Plaintiff mischaracterizes the administrative record to try and skew the facts in its favor. *See* ECF No. 46 at 2–4. But glancing at Plaintiff's record citations shows how unsupported its allegations are.

First, Plaintiff contends that from 1997 to 2000, FWS told it that its logging activities were unlikely to result in take under the ESA and accuses FWS of disregarding these statements. *Id*. But Plaintiff mischaracterizes the record and FWS's brief. One of Plaintiff's record citations is a letter FWS sent to Plaintiff recommending mitigation measures and field review before Plaintiff began timber operations because of the potential presence of two ESA-listed species. AR-9387–90; *see* ECF No. 46 at 2. Plaintiff also cites a letter from itself responding to a notice of intent to sue from environmental groups regarding a planned timber harvest, in which it claimed that FWS reviewed a timber management plan that Plaintiff prepared. AR-9287–88; *see* ECF No. 46 at 2. But Plaintiff does not acknowledge an FWS memorandum discussing that timber management plan, which notes that Plaintiff only allowed FWS to briefly review the document, preventing the agency from providing careful feedback and comments. AR-9347. The memorandum also notes that Plaintiff was unwilling to survey the potential habitat that FWS flagged in 1997. *Id.* And FWS's opening brief acknowledged the sequence of events described by the other documents Plaintiff cites, which illustrate that when Plaintiff listened to FWS, FWS then worked with Plaintiff to allow its projects to proceed in compliance with the ESA. ECF No. 45-1 at 6; *see* ECF No. 46 at 2–3.[9]

Second, Plaintiff contends that it submitted the deficient, 12-page draft HCP in March 2013 with FWS's encouragement. ECF No. 46 at 3–4. Plaintiff's incorrect characterization of the

---

[9] Plaintiff claims that FWS also omitted "critical context" from its description of Plaintiff's unsanctioned logging activities in 2008 and 2009. ECF No. 46 at 3. But Plaintiff's assertion to FWS in 2008 that its logging would not result in take without waiting for confirmation from the expert wildlife agency does not support Plaintiff's arguments.

submission neglects to acknowledge FWS's feedback on the draft HCP's shortfalls, which applied regardless of its status as an adaptive management HCP. *See* AR-4303; SAR-1018, 1022. Chief among FWS's concerns with the 2013 draft was that Plaintiff determined the research it planned to conduct—on the impact of modern timbering techniques on CM Salamander—would have *no effect* on the species. AR-4302–03. It defies logic to conclude that studies specifically designed to discern what effects may occur to a species will not affect that species. Thus, Plaintiff's contentions about the March 2013 draft HCP all fall flat.

Plaintiff's continued refusal to cooperate with FWS resulted in the agency finding that Plaintiff's HCP was incomplete. While Plaintiff complains that FWS has not explained what is missing from the draft HCP, the record shows that FWS has repeatedly told Plaintiff exactly that. AR-5219, 5179–80, 5128, 4345, 4303, 4150–52, 3771, 3755, 3645–47, 2283, 1787, 1471–537; SAR-1022; *see* ECF No. 46 at 10.[10] Plaintiff argues that FWS's examples of the information missing from the HCP means that FWS can discern the Project's likely impacts, but Plaintiff's criticisms ignore the other required elements of an HCP. *See* ECF No. 46 at 13. If Plaintiff does not include all activities known to potentially impact the species covered in the HCP, then it cannot accurately articulate measures necessary to offset that take. AR-62–63. And if Plaintiff does not discuss all the measures it will need to implement to offset take, then it also cannot accurately calculate how much funding those measures will require or guarantee that it has that funding. AR-65. For all these reasons, FWS reasonably concluded that Plaintiff's HCP was incomplete.

---

[10] Plaintiff incorrectly claims that it must only provide descriptions in the HCP that allow FWS to decide if the project will jeopardize the covered species. ECF No. 46 at 10. While the ESA Section 7(a)(2) jeopardy analysis is one of the analyses that FWS must perform, it must also determine if the HCP complies with Section 10(a)(2)(B), NEPA, and the National Historic Preservation Act. *See* ECF No. 45-1 at 16–17.

### B. The Conservation Plans Presented by Plaintiff Are Improper Extra-Record Evidence, and Regardless, They Are Not Comparable to Plaintiff's HCP.

The conservation plans that Plaintiff discusses on pages 11 to 13 of its response brief are improper extra-record evidence that the Court should not consider. In cases challenging an agency action, "[t]here is a presumption that the record compiled by the agency is the record on which it rested its decision." *Sanitary Bd. of City of Charleston v. Wheeler*, 918 F.3d 324, 334 (4th Cir. 2019). Courts generally "assume that the administrative record is complete and exclusive for purposes of judicial review." *Id.* "A party challenging an agency bears a special burden of demonstrating that the court should reach beyond the record . . . to examine information that should have been before the agency but was not[.]" *Id.* FWS did not include the conservation plans Plaintiff references in its administrative record. *See* ECF No. 46 at 11–12. And Plaintiff does not make any showing that the Court should consider extra-record evidence in this case, let alone meet its special burden. Plaintiff chose not to file a record motion by the appropriate deadline and has waived its ability to do so. *See* ECF Nos. 36, 38. Thus, the Court should exclude the extra-record conservation plans and the arguments that rely on them when considering the parties' motions.

Even if the Court does consider Plaintiff's arguments that rely on the extra-record conservation plans—which it should not—the plans that Plaintiff cites are not comparable to the draft HCP at issue in this case and thus irrelevant to the Court's resolution of the summary judgment motions. Plaintiff's HCP is for a single, local project, whereas the conservation plans Plaintiff refers to are for larger, regional-scale projects that do not require the same level of detail needed for a local project's HCP. And none of the conservation plans that Plaintiff cites discuss the unique biology and habitat requirements of the species addressed in Plaintiff's HCP.

The types of conservation plans cited by Plaintiff do not resemble its own HCP. FWS works with applicants on a variety of different types of conservation plans as part of its ITP

11

program. *See* HCP Handbook at 3-6–3-18. FWS assists applicants with determining the most appropriate conservation plan for their proposed projects based on the projects' complexity. Some factors considered include how many applicants there are, if the project is at a local or regional scale, and how many projects the ITP would cover. *Id.* In this case, Plaintiff engaged in the "simplest" ITP structure: a single applicant HCP seeking ITP coverage for a logging and housing development project. *See id.* at 3-10. But two of the conservation plans Plaintiff references—the 2019 LCRA TSC Transmission System HCP and the May 2020 Upper Santa Ana River Wash HCP—are both programmatic HCPs done at a regional scale, implemented by multiple parties, and provide coverage for many different activities. *Id.* at 3-10–3-12; *see* LCRA Transmission Services Corporation Transmission System Habitat Conservation Plan, SWCA Environmental Consultants at 1–2, 8 (July 2019), https://ecos.fws.gov/docs/plan_documents/thcp/thcp_3358.pdf (hereinafter "2019 LCRA TSC HCP") (covering the construction, operation, upgrade, decommissioning, and maintenance of electrical transmission lines, substations, access roads, and related infrastructure in 95% of Texas); Upper Santa Ana River Wash Habitat Conservation Plan, ICF at ES-1–ES-5 (May 2020), https://ecos.fws.gov/docs/plan_documents/thcp/thcp_3107.pdf (hereinafter "Upper Santa Ana River Wash HCP") (addressing water conservation, flood control, mining, agriculture, and roadways in southwestern San Bernardino County, CA). The third conservation plan Plaintiff references is a type of general conservation plan—another variety of regional-scale, programmatic conservation plan designed for various stakeholders to incorporate into their ITP applications. HCP Handbook at 3-13–3-14; *see* Oil and Gas Industry Conservation Plan, U.S. FWS (May 21, 2014), https://www.fws.gov/sites/default/ files/documents/example-industry-conservation-plan-final-habitat-conservation-plan-2015-05-21.pdf (hereinafter "Oil and Gas ICP"). These programmatic conservation plans are designed at a regional level to cover a

variety of potential future projects that will undergo further review before the projects' approval. In contrast, Plaintiff's HCP would cover a single, local project with no analogous subsequent review. Thus, the conservation plans Plaintiff references do not have the level of site-specific detail that Plaintiff should have included in its HCP and cannot be compared to it.[11]

Not only are the conservation plans referenced by Plaintiff plans for larger-scale programmatic projects, but none of them address the species at issue in Plaintiff's HCP. When preparing an HCP, the applicant must discuss existing information about the ecology of the species covered by the HCP to make sure there is an understanding of what types of actions could impact the species. Because different species have different ecological characteristics, every activity can impact different species in different ways. This is true even of species that may seem similar to a lay person, like the CM Salamander (*Plethodon nettingi*) and the Green Salamander (*Aneides aeneus*), both of which Plaintiff included in its draft HCP. The CM Salamander is a ground-dwelling, woodland salamander found in higher elevations in areas underlain with sandstone. AR-123–24. In contrast, the Green Salamander is a climbing salamander typically found in rock crevices or other outcroppings, not the forest floor, and that lives in lower elevations than the CM Salamander. AR-217–28. Because these species have different ecological characteristics, Plaintiff's proposed project is expected to impact them to different degrees. *See* AR-182.

The species in the extra-record conservation plans that Plaintiff refers to have no overlap with the species addressed in Plaintiff's HCP. The Oil and Gas ICP only addresses the American Burying Beetle. Oil and Gas ICP at 2. The Upper Santa Ana River Wash HCP addresses two plant

---

[11] In Part II of its response brief, Plaintiff cites a case which it claims supports its argument that FWS only requires general descriptions for HCPs. ECF No. 46 at 9. But the HCP at issue in that case was also a regional, programmatic HCP. *Nat'l Wildlife Fed'n v. Babbitt*, 128 F. Supp. 2d 1274, 1291 (E.D. Cal. 2000) ("[T]he Service's findings are plainly geared toward the regional nature of the HCP[.]"). Thus, that HCP is also not comparable to Plaintiff's single-project HCP.

13

species, two bird species, and the San Bernardino kangaroo rat. Upper Santa Ana River Wash HCP at ES-4. And none of the 23 covered species in the 2019 LCRA TSC HCP are the species discussed in Plaintiff's HCP. *Compare* 2019 LCRA TSC HCP at 25–26, *with* AR-121. Plaintiff's attempts to compare discussions about the effects of the different projects on different species compares apples to oranges. For example, while the LCRA TSC HCP addresses several salamander species, those species differ from both the CM Salamander and the Green Salamander. The species in the LCRA TSC HCP never leave the water, and thus do not cross roads, and are not known to experience edge effects from road construction. 2019 LCRA TSC HCP, Appendix D, Eurycea 1–3. So the 2019 LCRA TSC HCP's discussion of road construction and edge effects is useless when discussing the biology and habitat requirements of the species at issue in Plaintiff's HCP. These ecological differences are magnified by the differences in scale of the regional conservation plans, which as discussed above are necessarily more general compared to Plaintiff's single-project HCP.

While the Court should not consider Plaintiff's extra-record evidence, even if it does, the conservation plans Plaintiff raises are not comparable to its HCP and should not sway the Court. For all the reasons above and in FWS's brief in support of its opening motion, the Court should grant summary judgment in FWS's favor.

### III. No Remedy Is Warranted, but Should the Court Be Inclined to Grant Any Relief, It Should Be Limited to Vacatur and Remand of the Agency Decision.

While the Court should find that FWS's action was reasonable and consistent with governing law, even if the Court were to find a legal violation, it should not grant the relief requested by Plaintiff (which would only lead to the Phase 3 impracticalities discussed above). Instead, the Court should remand the decision to FWS so that the agency can choose how to proceed. *See Harrison v. Kendall*, --F. Supp. 3d--, No. 1:22-cv-1298 (LMB/JFA), 2023 WL 3016277, at *10 (E.D. Va. Apr. 20, 2023). As discussed in a recent Supreme Court opinion, "it is

a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quotation omitted). If a court finds that the agency's grounds inadequate, then the court remands the action to the agency, and the agency then chooses to either (1) "offer a fuller explanation of the agency's reasoning," or (2) "deal with the problem afresh by taking *new* agency action." *Id.* at 1907–08 (quotations omitted). Thus, if the Court finds it appropriate to impose a remedy, it should order the remedy endorsed by the Supreme Court: vacatur and remand for further agency action.

The cases Plaintiff cites are unpersuasive. The case *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253 (4th Cir. 2022), stands only for the proposition that plaintiffs in APA cases may seek any *type* of relief that is not compensatory relief, such as declaratory or injunctive relief. *Id.* at 262. It does not discuss what kinds of relief may or may not be appropriate when remanding an agency decision. *See generally id.* The other Fourth Circuit case cited by Plaintiff does not address whether courts have authority to direct agencies to take specific steps regarding the agency action on remand. *See Northrop Grumman Sys. Corp. v. Dep't of Labor*, 927 F.3d 226, 235–36 (4th Cir. 2019). And both *Northrop* and the unreported out-of-circuit case Plaintiff cites predate the Supreme Court's 2020 decision in *Regents*. *See id.*; *Friends of Wild Swan v. EPA*, 74 F. App'x 718, 721–22 (9th Cir. 2003).

## CONCLUSION

For all these reasons, Defendants' Cross-Motion for Summary Judgment (ECF No. 45) should be granted, and Plaintiff's Motion for Summary Judgment (ECF No. 41) should be denied.

Dated: November 9, 2023								Respectfully submitted,

WILLIAM J. IHLENFELD, II
United States Attorney

*/s/ Maximillian F. Nogay*
MAXIMILLIAN F. NOGAY
Assistant United States Attorney
(WV Bar No. 13445)
United States Attorney's Office
1125 Chapline Street, Suite 3000
P.O. Box 591
Wheeling, WV 26003
Tel: (304) 234-0100
E-mail: max.nogay@usdoj.gov

ERIN K. REISENWEBER
Assistant United States Attorney
(WV Bar No. 9537)
United States Attorney's Office
217 West King Street, Suite 400
Martinsburg, WV 25401
Tel: (304) 262-0590
E-mail: erin.reisenweber@usdoj.gov


TODD KIM
Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
S. JAY GOVINDAN
Section Chief
BRIDGET KENNEDY McNEIL
Assistant Section Chief

*/s/ Kamela A. Caschette*
Kamela A. Caschette
Trial Attorney
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 305-0340
E-mail: kamela.caschette@usdoj.gov

*Attorneys for Defendants*

16

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2023, I electronically filed the foregoing Reply in Support of Defendants' Cross-Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Maximillian F. Nogay*
MAXIMILLIAN F. NOGAY
Assistant United States Attorney
(WV Bar No. 13445)
United States Attorney's Office
1125 Chapline Street, Suite 3000
P.O. Box 591
Wheeling, WV 26003
Tel: (304) 234-0100
E-mail: max.nogay@usdoj.gov

*Attorney for Defendants*

17